IN the MATTER OF the GUARDIANSHIP OF
Joan I. EBERHARDY, Incompetent:

Quintin EBERHARDY and Mary Eberhardy, guardians,
Appellants-Petitioners,†

V.

CIRCUIT COURT FOR WOOD COUNTY, the Hon. Dennis D.
Conway, presiding, Respondent.

Supreme Court

*No. 78–661. Argued January 5, 1981.—Decided June 30, 1981.*

(Also reported in 307 N.W.2d 881.)

---

† Motion for reconsideration denied, without costs, on August 11, 1981.

For the petitioners there were briefs (in this court) by *Edward F. Zappen* and *Zappen, Meissner, Oestreicher, Craig & Hayden,* and *William J. Dehn,* guardian *ad litem,* with oral argument by *Edward F. Zappen* and *William J. Dehn,* all of Marshfield.

For the respondent the cause was argued by *Donald P. Johns,* assistant attorney general, with whom on the brief (in court of appeals) were *Bronson C. La Follette,* attorney general, and *George B. Schwahn,* assistant attorney general.

HEFFERNAN, J. This is a review of a court of appeals decision[1] affirming an order of the circuit court for Wood county which dismissed the guardians' petition seeking the court's approval for their consent to the surgical sterilization of a severely retarded adult daughter.

The question in this case is whether the circuit court has jurisdiction to authorize the duly appointed guardians of an adult mentally retarded female ward to give their consent to surgical procedures which will result in

[1] *In the Matter of Guardianship of Eberhardy,* 97 Wis.2d 654, 294 N.W.2d 540 (Ct. App. 1980).

the permanent sterilization of the ward when such sterilization is for contraceptive and therapeutic purposes, and whether, if the court has jurisdiction, it is appropriate for the court to exercise it for this purpose. We conclude that the requested action falls within the plenary constitutional jurisdiction of the circuit court; but we also conclude that, because of the complexities of the public policy considerations involved, opportunity should be given to the legislature to conduct appropriate hearings and to undertake factfinding which could lead to the declaration of public policy and legislative guidelines for the exercise of the court's plenary jurisdiction.

Accordingly, we affirm the decision of the court of appeals which upheld the circuit court's judgment declining to permit the guardians to give consent to the ward's sterilization.

Quintin and Mary Eberhardy, as parents and guardians, petitioned the circuit court for Wood county for authority to consent to the surgical sterilization of Joan, their twenty-two-year-old mentally retarded daughter. This petition was precipitated by Joan's attendance at St. Coletta's summer camp conducted for mentally retarded persons of both sexes and of all ages. Following return from this camp, Joan missed her menstrual periods for three months. Although the record is not clear, apparently there was some reason for her parents to believe that Joan had sexual contact with a male camper. Her menses thereafter resumed, but nevertheless the Eberhardys were deeply concerned over the harmful effect that a possible pregnancy would have upon Joan's physical and mental health.

The Eberhardys received counseling from Dr. Thomas Rice of the Marshfield Clinic, and also from Dr. Louis J. Ptacek, a pediatric neurologist at the Clinic. Both of these physicians had known and treated Joan for many years. Dr. Ptacek recommended that, because of Joan's

developmental disability and because of her low intellectual endowment, she be sterilized by a tubal ligation procedure. Dr. Ptacek concluded that, because Joan was again intending to go to the camp, something should be done to prevent the possibility of her becoming pregnant. He felt that she would be unable to care for a child and the chances of a child being severely handicapped were considerable.[2] Nevertheless, Dr. Rice originally considered that the placement of an IUD (intrauterine device) would be appropriate, and the fitting of an IUD was contemplated and a consent was given by Mary Eberhardy for that procedure. Subsequently, Joan's mother reconsidered her decision to prevent pregnancy by having Joan use an IUD and instead sought court approval of sterilization by tubal ligation.

Dr. Rice submitted the question of the propriety of sterilizing Joan to the medical ethics committee of St. Joseph's Hospital. The ethics committee gave its approval. On June 21, 1978, the Eberhardys were appointed guardians of Joan's person and estate; and on July 27 of the same year, they petitioned the circuit court for authorization to sign a medical consent to her sterilization.

Attorney William Dehn was appointed Joan's guardian *ad litem*. A notice of hearing was served upon Joan personally. At the hearing, the medical record of Joan was introduced, which traced her mental and physical development from the age of two weeks until the time just prior to the hearing. So far as the medical record reveals, the first characterization of Joan as mentally retarded appears to have been when she was about six

[2] Dr. Ptacek predicted that the chances were one out of four that a child born to Joan would be retarded. The record does not otherwise, however, disclose whether Joan's retardation has any genetic or hereditary characteristics.

years old.[3] The record also appears to indicate that in her early childhood she sat up, spoke, and walked at a normal age. An examination when she was fifteen indicated that her reading ability was comparable to the performance of a second grader, and she was able to spell at the performance level of a second or third-grade pupil. She was able to count objects correctly and to give the names of any numerals presented to her. Her addition and subtraction skills were, however, markedly below normal. Although she could respond to questions in short, well-articulated sentences, her communications skills were considered to be substantially subnormal. At the age of fifteen, the neurological evaluation characterized her as being of moderate mental retardation.

A perusal of the entire medical record might lead to the conclusion that Joan's mental ability regressed between the time of this psychological examination in 1971 and the time the petition for sterilization was heard in September of 1978. There is no doubt, from the medical record, that appropriate and careful medical and psychological testing after the age of six consistently showed her to be substantially retarded.

The evidence adduced at hearing was consistent with the medical record. Her father testified that, although Joan, now twenty-two years old, was able to feed herself, she was unable to cut her food, and she could not properly dress herself. Although she could bathe herself, she could not safely regulate the temperature of her bath. If left by herself, she was unable to find her way home. Accordingly, she was never left alone. Eberhardy stated that he had consulted with physicians and that they favored sterilization to prevent the trauma of

---

[3] It is possible, of course, that developmental abnormalities may have been present (and diagnosed) earlier. The medical record, however—otherwise fairly extensive in describing the medical care provided for various childhood maladies—does not so indicate.

a pregnancy. He was satisfied that Joan could not care for a child, and he concluded that it would be in Joan's best interest if she were sterilized. He said he was sixty-five and that his wife was sixty-two. He said he did not know who would be able to take care of things if they were not there to attend to Joan.

Joan's mother confirmed her husband's testimony and stated that Joan had little judgmental ability, was unaware of the dangers of moving traffic, and was incapable of explaining the nature of any pain or discomfort, and concluded that this would be a problem in the event of Joan's pregnancy.

Dr. Ptacek also testified. He stated that, at the time of the hearing, Joan was physically well and moderately severely retarded. He explained this to mean that she had a mental age of two to three years and that her capabilities in the area of judgment, decision, memory, or communication were very slight. He stated that Joan had the same sexual proclivities as a normal person and possibly could become pregnant if not under total and complete supervision at all times. He said that she was an extremely lovable and happy person, was friendly, but had such extremely low mental endowments that she would not be able to resist sexual advance. He stated that she would not be able to care for herself nutritionally if she became pregnant, that labor and delivery would be physically and psychologically traumatic, and that she could not possibly care for a child adequately. He felt tubal ligation would be in Joan's best interests. He said there was no possibility of Joan's condition improving and that, in all likelihood, there would be further deterioration.

Following the hearing, the court directed that further physical and psychiatric examinations be made. Dr. Ptacek in his report reiterated the statements made at the hearing. A psychiatrist also reported that Joan was

retarded to the extent that she could not understand the implications of sexual behavior, that she could easily be sexually exploited, and that her pregnancy would be tragic. He found no psychiatric counter-indication to tubal ligation, and in fact would encourage it.

The attorneys for the guardian-parents urged, on the basis of the reports and facts adduced at the hearing, that the evidence showed clearly and without contradiction that sterilization was in the best interests of Joan.

The guardian *ad litem* in a detailed, well-reasoned report argued that the circuit court had the authority and the jurisdiction to authorize the guardian-parents to give their consent to the sterilization proceedings. He also argued that the right to bear children or not to was a fundamental civil right and that to deprive Joan of treatment necessary to her well being guaranteed to others because she was incompetent to give consent would raise a question of the denial of the equal protection of the law.

The circuit judge, however, for reasons that were not explained, concluded that the benefit to Joan that would inure from sterilization was "questionable."

As the record shows, Joan did not testify, nor is there anything in the record to show that she was ever asked or consulted about the proposed surgical procedures. The court found, however, that she would not understand the nature of the operation nor have the capacity to consent. The trial judge stated that:

"[I]f the court has the authority to authorize the sterilization . . . Joan Eberhardy, given the facts stated . . . is a proper subject for sterilization. Her inability to care for herself and the medical testimony of her inability to care for a child are sufficient to convince the court on that point."

Although the trial judge failed to use the terminology that sterilization would be in Joan's "best interests," such is the tenor of his decision. He, however, denied the

petition because of the total absence of any statutory authority to authorize sterilization. He observed that the only sterilization statute which had ever existed in Wisconsin authorized the sterilization of persons confined to institutions and then only following the administrative procedures by the Department of Health and Social Services. Moreover, this sole legislative sanction for sterilization had been repealed in 1977. He also concluded that the authority given to a guardian of a person "to secure necessary care, services or appropriate protective placement on behalf of the ward" (sec. 880.38 (2), Stats.) did not authorize sterilization. He did not assert that the court lacked "jurisdiction" to act, only that he found no authorization in the statutes. He emphasized that the right to bear children is a basic right, which cannot be denied without a compelling reason. He found that the statutes did not set forth any compelling reason or public policy declaration that would authorize the court to act on the petition; and, accordingly, it was dismissed.

Upon appeal by the Eberhardys as guardians, the court of appeals affirmed the order of dismissal, concluding that neither the statutes nor the constitution authorized or conferred jurisdiction upon Wisconsin courts to authorize a consent to the sterilization of incompetent persons.

Because this case is one of initial impression in this state and because of its possible potential social and legal consequences, we have granted the petition of Joan's parents and the petition of the guardian *ad litem* to review the decision of the court of appeals.

The trial court appeared to equate its lack of statutory authority with lack of jurisdiction, and the court of appeals specifically found that the proposed sterilization order was beyond the jurisdiction of the circuit

court. Accordingly, it is essential that we consider that question first.

After taking evidence and evaluating the arguments of the guardian *ad litem,* the trial court concluded that it was "without power to approve the operation and that there is no such power in this court." The court of appeals, in affirming the circuit court's order, expressly stated:

"[U]nless and until the legislature confers express power on Wisconsin courts to authorize the sterilization of incompetent persons under stated circumstances, the courts are without jurisdiction to consider the same." 97 Wis.2d at 668.

This view of jurisdiction, founded solely upon statutory authorization, is too narrow and does not comport with the precedents of this court. We conclude that, under the Constitution of the State of Wisconsin, the circuit court had the jurisdiction to approve of the proposed tubal ligation; and, additionally, we conclude that the statutes acknowledge the plenary jurisdiction of Wisconsin circuit courts. The Wisconsin Constitution, art. VII, sec. 8, declares:

"Except as otherwise provided by law, the circuit court shall have original jurisdiction in all matters civil and criminal within this state . . . ."

This grant of jurisdiction is extremely broad. In *State ex rel. Attorney General v. Portage City Water Co.,* 107 Wis. 441, 447, 83 N.W. 697 (1900), this court said:

"The scope of this general grant of authority was said in *Putnam v. Sweet,* 2 Pin. 302, and also in *Att'y Gen. v. Railroad Cos.,* 35 Wis. 531, to include greater power than was probably ever before, in a free government, delegated to any one tribunal,—the united powers of the English kings bench, common pleas, exchequer,

and chancery." *See also State ex rel. Pierce v. Kundert,* 4 Wis.2d 392, 394, 90 N.W.2d 628 (1958).

Justice Roujet D. Marshall in his monumental opinion, *Harrigan v. Gilchrist,* 121 Wis. 127, 99 N.W. 909 (1904), said:

". . . standing where we will and looking where we may, judicial power is present to prevent and redress wrongs. We take a view to the very horizon of our mental perception within the scope of human capacity to violate obligations other than those of a purely moral nature, and the jurisdiction of our circuit courts, except as specially restricted by statute within legislative power to do so or by the constitution itself—those exceptions not, however, affecting the matter in hand—is found to occupy the whole field with instrumentalities designed, and as well adapted as human wisdom has been capable of making them, to execute its function to completeness . . . . How vast that is in its chancery field can best be appreciated by applying thereto the standard of measurement which the distinguished men who have been significant in the development of our system have taught us must be used to span it: 'Equity will not suffer a wrong to go without a remedy.' . . .

"In the foregoing the term 'jurisdiction' is used in its broad, general sense,—that of judicial power. A court may have jurisdiction of a particular subject matter, but by settled judicial policy ought not to exercise it. . . .

". . .

"The circuit courts of this state have, under the constitution, succeeded to all the jurisdiction formerly exercised by courts of law and courts of chancery as well . . . ." pp. 227–31)

The circuit courts of Wisconsin are constitutional courts and, unlike special courts which may be created from time to time by the legislature, under art. VII, sec. 2, are courts of plenary jurisdiction. They "do not depend solely upon statute for their powers." *Stevenson v. Milwaukee County,* 140 Wis. 14, 17, 121 N.W. 654

(1907). Unlike the relationship between the Congress and the federal courts, under which the Congress may grant or withhold jurisdiction as it pleases, in Wisconsin the jurisdiction and the power of the circuit court is conferred not by act of the legislature, but by the Constitution itself. *Jelke Co. v. Beck*, 208 Wis. 650, 660, 242 N.W. 576 (1932). Circuit court jurisdiction is general and extends to all matters civil and criminal. *Mack v. State*, 93 Wis.2d 287, 294, 286 N.W.2d 563 (1980); *State ex rel. First National Bank v. M & I People's Bank of Coloma*, 95 Wis.2d 303, 308 n. 4, 290 N.W.2d 321 (1980).

The language of art. VII, sec. 8, as it now appears in the constitution is that adopted by the amendment of April 1977. That language provides that the jurisdiction of the circuit court shall extend to all matters within the state "[e]xcept as otherwise provided by law." Prior to that amendment, the limitation granted jurisdiction "not excepted in this constitution, and not hereafter prohibited by law." This change, however, is not substantive. It has previously been pointed out that this language only allows for a legislative reallocation of jurisdiction from the circuit court to another court. It does not permit the legislature to divest the constitutional grant of jurisdiction from the unified court system; and under the unified system created by the amendment of 1977, original jurisdiction is vested wholly in the circuit court.[4] Under the superintending powers of the supreme court, the practical exercise of that power may be allocated to different branches of the circuit court. This allocation, however, does not affect the jurisdiction of any of the circuit courts. The legislative allocation of jurisdiction under the constitution as it existed

---

[4] Subject, of course, to appellate jurisdiction and the constitutional authority of the supreme court to exercise original jurisdiction in certain cases. Wis. Const., art. VII, sec. 3(2).

prior to 1977 was discussed in Hallows & DeWitt, *The Need for Court Organization*, 1954 Wis. Law Rev. 377, 387 n. 54. It was pointed out therein that the legislative authority—to reallocate judicial power and to transfer it from one court to another—could not abrogate the court system's powers. Rather, as was said in *State v. Wimberly*, 55 Wis.2d 437, 441, 198 N.W.2d 360 (1972), quoting *Callanan v. Judd*, 23 Wis. 343 (1868), the language was designed:

". . . to enable the legislature to distribute the jurisdiction in both matters at law and in equity, as between the circuit courts and the other courts in the state . . . ."

Because the jurisdiction conferred by the constitution in 1977 upon circuit courts is plenary in respect to all matters at law or in chancery, jurisdiction, in the sense of judicial power to act, is not dependent upon legislative authorization.[5] Circuit courts of the State of Wisconsin have the constitutional jurisdiction to consider and rule on petitions for sterilization of incompetents.

The State of Washington recently confronted a similar problem, *In the Matter of the Guardianship of Hayes*, 93 Wash.2d 228, 608 P.2d 635 (1980). The State of Washington's constitution, like Wisconsin's, grants original jurisdiction to its trial courts in all cases in which the jurisdiction is not vested by the constitution in some other court. There is no legislative authorization for the trial courts of Washington to entertain and rule on petitions for sterilization of incompetents. Nevertheless, the Supreme Court of Washington held:

---

[5] Because the problem does not arise in the context of this case, we do not consider circumstances under which certain conditions precedent must occur prior to the exercise of jurisdiction. *See Lees v. ILHR Dept.*, 49 Wis.2d 491, 497, 182 N.W.2d 245 (1971), and cases cited therein.

"Under this broad grant of jurisdiction the superior court may entertain and act upon a petition from the parent or guardian of a mentally incompetent person for a medical procedure such as sterilization. No statutory authorization is required. . . .

"We therefore hold that Washington Const. art. 4, sec. 6 gives the superior courts of this state the jurisdiction to entertain and act upon a request for an order authorizing sterilization of a mentally incompetent person." *Hayes, supra,* 608 P.2d at 638–39.

The Wisconsin statutes specifically acknowledge the broad constitutional grant of jurisdiction to the Wisconsin court system. Although sec. 801.04, Stats., recites that a court may entertain a civil action only when it has the power to hear the kind of action brought, it refers to this power as "jurisdiction of the subject matter" and further recites:

"Jurisdiction of the subject matter is conferred by the constitution and statutes of this state and by statutes of the United States . . . ."

It is apparent, therefore, that the legislature has specifically acknowledged the grant of subject matter jurisdiction to the Wisconsin courts by the Constitution. The general jurisdictional statute referring to circuit courts, sec. 753.03, Stats., recognizes the allocative powers of the legislature to distribute constitutionally granted jurisdiction to various courts of the state, but acknowledges, "The circuit courts have the general jurisdiction prescribed for them by the constitution . . ." That section further provides that:

"The circuit courts have power to hear and determine, within their respective circuits, all civil and criminal actions and proceedings unless exclusive jurisdiction is given to some other court; and they have all the powers, according to the usages of courts of law and equity, necessary to the full and complete jurisdiction of the causes and parties and the full and complete administra-

tion of justice . . . subject to review by the court of appeals or the supreme court as provided by law."

It is thus apparent that the legislature by this statute has given express and broad recognition to the fact that the basis of circuit court jurisdiction is constitutional; and, because the circuit court is the only trial court recognized by the constitution, its jurisdiction is all-encompassing, subject only to the appellate and supervisory powers reserved by the constitution to the court of appeals and the supreme court. We have previously described this statute as the legislative acknowledgment of the broad constitutional jurisdiction of the circuit court. *See State ex rel. Di Salvo v. Washington County Court,* 79 Wis.2d 27, 37, 255 N.W.2d 459 (1977).

The recent United States Supreme Court case of *Stump v. Sparkman,* 435 U.S. 349 (1978), *reh. den.* 436 U.S. 951 (1978), dealt with the question of whether an Indiana judge was immune from damages under the Federal Civil Rights Act in a suit brought by a retarded woman whose sterilization the judge had ordered upon a mother's petition when the plaintiff was a minor. The United States Supreme Court held that the judge was immune from liability. It did so on the basis of an Indiana statute similar to sec. 753.03, Stats., which conferred upon the Indiana circuit court original jurisdiction "in all cases at law and in equity whatsoever." (p. 357)

While the *Sparkman* record is replete with evidence of abuse of power by the judge of the Indiana court because no notice had been given to the minor and, in fact, it reveals that she was fraudulently induced to undergo the sterilization when it was represented to her that she was to have an appendectomy, the Supreme Court's decision clearly stands for the proposition that a state trial court which is vested with statutory jurisdiction "in all cases

at law and in equity" acts within its jurisdiction when it orders the sterilization. It is noteworthy, moreover, that jurisdiction in *Sparkman* was upheld although the only statutory reference to sterilization was in respect to the sterilization of institutionalized persons under special circumstances, and although the Supreme Court concluded that the Indiana court acted erroneously in ordering the sterilization and in its failure to require minimum standards of fairness and due process.

As the court of appeals appropriately recognized, *Sparkman* is not controlling on Wisconsin courts, because the issue in *Sparkman* was judicial immunity, where for policy reasons a judge's authority traditionally has been construed broadly. Also, the United States Supreme Court's interpretation of another state's law does not bind this court in respect to interpreting its own law. Nevertheless, the essential reasoning of the United States Supreme Court that a broad statutory grant of jurisdiction is sufficient to support jurisdiction to consider sterilization petitions is persuasive. In Wisconsin there is, in addition to and even more fundamental than the broad statutory acknowledgment of circuit court jurisdiction, the express and plenary grant of jurisdiction by the constitution.

The Supreme Court in *Sparkman* also considered the question whether the express statutory authorization for the sterilization of certain institutionalized persons was tantamount to a legislative restriction or a definition of the limits on the otherwise full grant of jurisdiction conferred elsewhere in the Indiana statutes. It held it was not.

A similar issue is posed in the instant case and arises out of heretofore existing statutory policy authorizing the sterilization of some of the institutionalized mentally retarded . The Wisconsin statute was originally enacted as ch. 693 of the Laws of 1913, and (after being

renumbered to sec. 46.12, Stats., by ch. 328, sec. 19, Laws of 1919) it remained a part of the Wisconsin statutory law, largely unchanged, until repealed by ch. 428, sec. 4, Laws of 1977.[6] As an argument against the authority of the Wisconsin circuit court to permit a consent to the sterilization of an incompetent, it is urged that the Wisconsin statute passed in 1913 constituted a public-policy declaration that certain types of persons could be ordered sterilized and that, when that statute was repealed

---

[6] In its final version, sec. 46.12, Stats. 1975, provided in its entirety:

"46.12 **Sterilization of defectives.** (1) The department may appoint a surgeon and a psychiatrist, of recognized ability, as experts, who (in conjunction with the superintendents of the state and county institutions who have charge of criminal, mentally ill and mentally deficient persons) shall examine inmates and patients of such institutions as to their mental and physical condition.

"(2) The department may submit to the experts and to the superintendent the name of inmates or patients they desire examined, and the experts and the superintendent shall meet, take evidence and examine into the mental and physical condition of the named inmates or patients and report thereof to the department.

"(3) If the experts and superintendent unanimously find that procreation is inadvisable the department may authorize an operation for the prevention of procreation.

"(4) Before such operation, the department shall give at least 30 days' notice in writing to the husband or wife, parent or guardian of the inmate or patient, if known, and if unknown, to the person with whom such inmate or patient last resided.

"(5) The experts shall receive as compensation $10 per day and expenses for the days consumed in the performance of their duties.

"(6) The record made upon the examination shall be filed in the department; and semiannually after the operation, the superintendent of the institution where such inmate or patient is confined shall report to the department his condition.

"(7) The department shall state in its biennial report the number of operations performed under this section and the result of the operations."

in 1977, the proper interpretation to be placed upon that repealer was that it was a public-policy declaration that no persons were to be sterilized.

The history of the 1913 legislation on the question of sterilization leads us to the conclusion that it is irrelevant to the problem posed by this case. The 1913 statute came as a consequence of a flurry of academic and social activity founded upon the theory that problems which society had with the mentally ill, the retarded, the epileptic, the criminal, and the pauper could be eliminated by the sterilization of persons so characterized.

A reading of the literature advocating such eugenic sterilization indicates that it was founded upon the re-articulation of the Mendelian theories of inheritance, coupled with the development of simple, surgical techniques for sterilization. *See, e.g.,* Ferster, *Eliminating the Unfit—Is Sterilization the Answer?* 27 Ohio St. L. J. 591, 591–94 (1966). During this period, well informed, humane, and progressive social reformers advocated eugenic sterilization in such laudatory terms that it was conceived by many to be a panacea for most of the troubles that had been created by "misfits" in our society. This is not an appropriate place to evaluate the correctness of those theories, nor is a court a properly equipped forum—either from the viewpoint of scientific expertise or complete awareness of public-policy considerations—to make such an evaluation. Suffice it to say, the initial enthusiasm for laws requiring eugenic sterilization has waned, and many of them have been repealed.

The Wisconsin law as enacted in 1913 related "to the prevention of criminality, insanity, feeble-mindedness and epilepsy."[7] The provision, as it appeared in the stat-

---

[7] For an excellent—and disturbing—account of how and why eugenic sterilization was embraced by Wisconsin Progressives, and a discussion of the legislative history and enactment of sec. 46.12, Stats., see R. Vecoli, *Sterilization: A Progressive Measure?* in Wisconsin Magazine of History, Spring 1960, p. 190.

utes, bore the less grandiose title of "Sterilization of defectives." Sec. 46.12, Stats. 1975. The 1913 statute applied only to criminal, insane, feeble-minded, and epileptic persons who were confined to a public institution; and, even though there were large numbers of noninstitutionalized persons who fitted into the categories which were subject to sterilization, the law was not applicable to them.

It is noteworthy also that the legislative authorization was given to the State Board of Control (later the Department of Health and Social Services), which was given the power to appoint a surgeon and an alienist to periodically examine institutionalized persons. Under the law, if there were unanimous agreement by the examining physicians and the superintendent of the inmate's institution, the State Board of Control could order an operation for the prevention of procreation.

From the time of its enactment in 1913 to the time of its repeal in 1977, the statute remained virtually unchanged. However, epileptics were deleted from the sweep of the statute by chs. 457 and 534 of the Laws of 1955. The Wisconsin eugenic sterilization statute was one of the first enacted, but because of questions in respect to the constitutionality of compulsory sterilization statutes, many state legislatures withheld their approval until the landmark case of *Buck v. Bell*, 274 U.S. 200 (1927). In that opinion, Justice Holmes stated:

"We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad

enough to cover cutting the Fallopian tubes. . . . Three generations of imbeciles are enough." (p. 207)[8]

Within ten years of *Buck v. Bell,* 20 states passed eugenic sterilization statutes. *Buck v. Bell* represented the high point of enthusiasm for eugenic sterilization.

Both the scientific validity of eugenic sterilization and the constitutionality of such laws have been called into question in recent years. The scientific aspects are discussed generally in Ferster, *Eliminating the Unfit—Is Sterilization the Answer?* 27 Ohio St. L. J. 591, 602–04; Bligh, *Sterilization and Mental Retardation,* 51 A.B.A. Journal 1059 (1965); and Note, *Eugenic Sterilization— a Scientific Analysis,* 46 Denver L. J. 631 (1969). And from a constitutional viewpoint, in 1942, in *Skinner v. Oklahoma,* 316 U.S. 535 (1942), the United States Supreme Court recognized procreative decisional choices as being encompassed within a fundamental constitutional right. *See also Developments in the Law: The Constitution and the Family,* 93 Harv. L. Rev. 1159, 1296–1308 (1980); Comment, *Eugenic Sterilization Statutes: A Constitutional Re-Evaluation,* 14 J. Fam. L. 280 (1975).

It should be emphasized, however, that the sterilization sought by the Eberhardys for their daughter, Joan, was not for eugenic purposes, but was rather for contraceptive and therapeutic purposes to protect the physical and mental well being of Joan. The only reference to the question of hereditary defectives in the record is the statement of Dr. Ptacek that there was a 25 percent chance that any child of Joan's would be mentally re-

---

[8] Justice Holmes' ringing declaration of confidence in the state of eugenic knowledge as it existed in 1927 has frequently been criticized, particularly when it became known at a later date that the child born to Carrie Buck, the subject of sterilization in *Buck v. Bell,* had previously given birth to a child who was "very bright." Murdock, *Sterilization of the Retarded: A Problem or a Solution?* 62 Cal. Law Rev. 917, 921 n. 22 (1974).

tarded.[9] This statement, however, is irrelevant, because there was no assertion the purpose of the proposed sterilization was to avoid the birth of a defective child. It was sought only to accommodate the best interests of Joan herself, and no societal benefits were urged.

The only public-policy meaning that can be ascribed to the repeal of the eugenic sterilization law passed in 1913 is immaterial to Joan's situation. All that can be concluded from its repeal is that the legislature became disenchanted with either the efficacy of eugenic sterilization of institutionalized persons or became concerned with the constitutionality of mandatory sterilization without due-process procedures and the consent of the person to be sterilized.[10]

---

[9] The medical record introduced at the hearing does not disclose the etiology of Joan's disability. It characterizes Joan's retardation, at different times in her life, variously in terms such as "non-specific," "due to generalized cerebral dysfunction of uncertain etiology," compatible with "diffuse moderately severe encephalopathy," etc.

[10] An amendment proposed in 1967 would have limited the potential institutionalized subjects to *"hereditary* mental deficients"* (emphasis supplied), deleting the criminal and mentally ill, and would have added other procedural safeguards. The bill died in committee in its house of origin. *See* No. 873, A. (1967).

By 1964, it appears that the statute was no longer being used by the Department of Health and Social Services. *See* Fiscal Note to S.B. 761 (1971). Repeal efforts began in 1969 (A.B. 784), were repeated in 1971 (S.B. 761), and succeeded in 1977 (A.B. 898, ch. 428, sec. 4, Laws of 1977).

For a review of sterilizations performed under sec. 46.12, Stats., from 1913 to 1947, *see* Odegard, *Operation of Sterilization Statutes in Wisconsin Outlined,* Public Welfare May 1947 (p. 15). For other commentaries on the operation of the law, *See* Ferster, *Eliminating the Unfit, supra,* Appendix C at 633; Richmond, *Sterilization in Wisconsin,* 25 J. Crim. L. & Criminology 586 (1934); Beier, *The Operation of the Wisconsin Sterilization Law,* Minn. Bd. of Control Q., May 1920, p. 7.

The 1913 legislation was, moreover, a grant of power to a state administrative agency, the Board of Control. It did not purport to either limit, expand, or re-allocate a circuit court's common law jurisdiction. The repeal of the statute left court jurisdiction untouched. It withdrew from an administrative agency the power previously conferred.

The repeal of the mandatory eugenic sterilization law is irrelevant to public policy or the court's jurisdiction in respect to nonmandatory therapeutic or contraceptive sterilization procedures of uninstitutionalized incompetent persons. We conclude, therefore, that the legislative history of the 1913 sterilization law neither sanctions nor precludes sterilization under the circumstances posed in this case.[11]

Our history shows that the Attorney General, in formal opinions during the life of the eugenic sterilization

[11] Although we have concluded that the history of the 1913 legislation is irrelevant to the problem in this case, other rejected legislative proposals merit brief comment. Bill No. 682, A. (1935), *inter alia*, would, as amended, have authorized a spouse, parent, or legal personal guardian of a person who is "in such mental condition that he can not understand the effect of the treatment" to petition the county court for sterilization. The legislation provided that the court "shall" approve the sterilization if certain conditions were met. Under the bill, sterilization was to be appropriate if such a subject were old enough to conceive; had either an inheritable form of feeble-mindedness or *"an incurable disease or defect such that pregnancy will probably cause her death or serious permanent illness or injury"* (emphasis supplied); and that the sterilization could be performed with safety to the subject. *See also* Nos. 376, S. (1935) and 437, A. (1937). A somewhat similar bill, No. 436, A. (1939) (as amended), was also rejected. While we should not read much into the legislature's rejection or non-action on a bill, particularly where the legislation contains other provisions which could also explain the bill's demise, it is at least significant that there have been rejections of proposed legislation where a major concern of the legislation was not eugenic but concern for the incompetent's well being.

law, ruled frequently on the question of whether voluntary and consented-to therapeutic or contraceptive sterilizations could be performed without violating the laws of criminal mayhem. Originally the Attorney General ruled that sterilizations performed on noninstitutionalized incompetent persons under the administrative authority of the superintendent of the Wisconsin State Hospital would violate the criminal laws. 17 Op. Atty. Gen. 524 (1928). The attorney general handed down a similarly restrictive ruling in 1932 in 21 Op. Atty. Gen. 940 (1932), stating that a competent adult's purported consent to contraceptive sterilization might not immunize the performing physician from criminal liability. However, six years later, the attorney general, in a formal opinion, concluded that a voluntary vasectomy of a competent noninstitutionalized person when such vasectomy was necessary to preserve health would not constitute criminal mayhem. 27 Op. Atty. Gen. 416 (1938), and in 1968, in 57 Op. Atty. Gen. 191, the attorney general concluded that a contraceptive sterilization performed by a physician at a voluntary and rational request of a patient did not constitute mayhem or any other crime.

Thus, by 1968, it had been determined by the Attorney General that neither therapeutic nor contraceptive sterilizations when voluntarily consented to implicated any aspect of the criminal law. They were personal decisional choices.

Although this court has never had occasion to rule on the subjects decided by the Attorney General, the position of that office is consistent with that of the United States Supreme Court in its recognition of the fundamental decisional right of a citizen to procreate or not. *Skinner v. Oklahoma, supra,* struck down an Oklahoma statute on equal-protection grounds, because it authorized the sterilization of some criminals but not other criminals. Justice Douglas, speaking for the court in that case, said, "Marriage and procreation are fundamental

to the very existence and survival of the race." 316 U.S. at 541.

Later, in *Griswold v. Connecticut*, 381 U.S. 479 (1965), the court struck down a Connecticut statute which criminalized the use of contraceptives. This law was challenged by a married couple, and the court held that the Connecticut statute infringed the fundamental right of marital privacy. In 1972, in *Eisenstadt v. Baird*, 405 U.S. 438 (1972), it was held that the rationale of *Griswold* extended to unmarried persons and that contrary state laws violated equal protection guarantees. The court held:

"If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (p. 453)

In *Carey v. Population Services International*, 431 U.S. 678 (1977), Justice Brennan, again invoking the right of personal privacy without unjustified governmental interference, stated:

"The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. . . . regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." (pp. 685–86)

What emerges from these cases is consistent with the opinions of the Wisconsin Attorney General—that sterilization implicates a protected personal procreative decisional choice.

While the United States Supreme Court has never specifically addressed sterilization except in equal-protection terms, the rationale of the cases referred to and the conclusion that the right to procreate or to prevent

procreation is a protected, fundamental personal decisional choice appears to be clearly relevant to the case before us.[12] Starting with the explicit ruling of the Attorney General of the State of Wisconsin that no criminal law of the State of Wisconsin is violated and the implicit assumption of the United States Supreme Court that sterilization sought by a competent person for a therapeutic or contraceptive purpose is probably within the ambit of a protected constitutional right when the subject can give a voluntary and informed consent, the question posed is whether this court has a constitutional duty to authorize a guardian of an incompetent to consent to the sterilization of the incompetent when sterilization is for a therapeutic or contraceptive purpose and is in the best interests of the ward. If a competent person has the right to sterilization, can that right be withheld from an incompetent?

The New Jersey Supreme Court very recently answered "no" to that question. *In re Grady*, 85 N.J. 235, 426 A.2d 467 (1981). In reaching that conclusion, the New Jersey Supreme Court considered the requested sterilization of a nineteen-year-old mentally-impaired woman seriously afflicted with Down's Syndrome. The facts considered by the New Jersey court are strikingly similar to those presented in the Wisconsin circuit court in regard to Joan. The New Jersey court stated:

"Lee Ann Grady has the same constitutional right of privacy as anyone else to choose whether or not to undergo sterilization. Unfortunately, she lacks the ability to make that choice for herself. We do not pretend that the choice of her parents, her guardian *ad litem*, or a

---

[12] Discussing the constitutional protection afforded to sterilization decisions of competent persons, *see In re Grady*, 85 N.J. 235, 426 A.2d 467 (1981), and cases discussed therein; *Developments—The Family, supra*, 93 Harv. L. Rev. at 1307–08; Comment, *A Constitutional Evaluation of Statutory and Administrative Impediments to Voluntary Sterilization*, 14 J. Fam. L. 67 (1975).

court is her own choice. But it is a genuine choice never-theless—one designed to further the same interests she might pursue had she the ability to decide herself." 426 A.2d at 480.

The jurisprudential background upon which the New Jersey court decided *Grady* is substantially different than that in which we view the present case. Although the New Jersey court went through a careful analysis to determine whether the sterilization of Lee Ann Grady was in her best interests, its decision was substantially based upon the case of *In re Quinlan,* 70 N.J. 10, 355 A. 2d 647, *cert. den.* 429 U.S. 922 (1976), decided five years earlier. In *Quinlan,* the New Jersey court authorized the substituted consent by the parents of a comatose twen-ty-two-year-old woman to discontinue use of extraor-dinary artificial life support apparatus. In *Grady,* re-ferring to *Quinlan,* the New Jersey court said:

"We exercised our equitable powers there although we believed that our decision would probably lead to the natural death of the patient. Our decision took into con-sideration the interests of the public and the belief of our society in the supreme value of life. We were well aware of the risks of exercising powers directly affect-ing the opportunity of another human to live or die. But ultimately we decided that the patient's constitutional right of privacy outweighed the public interest in pre-serving her life and presented a compelling case for judicial intervention. Similar compelling considerations exist in the present case [for the sterilization of Lee Ann Grady]." 426 A.2d at 480.

Having made the decision in *Quinlan* to allow the woman in that case to "choose" to die as the exercise of her right of privacy, it was a short leap indeed for the New Jersey Supreme Court to authorize the sterilization of Lee Ann Grady on the same constitutional ground. Our jurisprudence, however, reveals a substantial void

in respect to cases of this kind.[13]  We do not fault the New Jersey court for either of its decisions on either humanitarian or jurisprudential grounds.  Both opinions are carefully reasoned and are rationally justifiable. But we find it somewhat too facile when discussing the right of privacy, which by definition necessarily refers to the person involved, to find that there is a genuine

[13] The parties and the courts below referred to the case of *In re Guardianship of Pescinski*, 67 Wis.2d 4, 226 N.W.2d 180 (1975). The court of appeals, in particular, appears to have read *Pescinski* as supporting its conclusion that a Wisconsin circuit court is without judicial power to authorize a sterilization such as the one proposed in this case.

In *Pescinski*, the guardian of an institutionalized schizophrenic petitioned the county court for authorization for the transplant of a kidney to a sister whose kidneys had been removed and whose condition was deteriorating. No other family members were available as donors. No "real" consent for the procedure was obtained from the incompetent prospective donor, nor any from his guardian *ad litem*. There was "absolutely no evidence . . . that any interests of the ward will be served by the transplant." *Id.* at 7. This court ruled that, absent real consent by the ward, there was no power in the county court to approve the operation. It stated that, "There is no statutory authority given the county court to authorize a kidney transplant or any other surgical procedure on a living person," and expressly declined to adopt the substituted judgment doctrine in Wisconsin. *Id.* at 7–8. The last paragraph of the opinion emphasized the importance of not taking advantage of incompetents and stated that, absent "real" consent and in a situation where no benefit to the ward has been shown, the county court (and this court) have no authority to approve the operation.

As our discussion, *supra*, on the plenary constitutional jurisdiction of Wisconsin circuit courts indicates, *Pescinski*, despite some of its broad language, should not be read as a ruling of want of jurisdiction. Rather, like the present case, *Pescinski* represents the exercise of judicial restraint under particular circumstances. Those circumstances included the lack of consent of the guardian *ad litem*, no showing of benefit to the ward, and an absence of legislative guidance. *Pescinski* should not be read as a ruling of want of jurisdiction, and, insofar as it may, we disavow that conclusion.

choice when that choice cannot be personally exercisable. It is indeed true that in *Grady* there was a decision, but it was not the decision of Lee Ann Grady pursuant to her right of privacy. We believe it somewhat inconsistent for the New Jersey court to equate in a single breath "the choice made in her behalf" and "providing her with a choice." 426 A.2d at 481.

The fault we find in the New Jersey case is the *ratio decidendi* of first concluding, correctly we believe, that the right to sterilization is a personal choice, but then equating a decision made by others with the choice of the person to be sterilized. It clearly is not a personal choice, and no amount of legal legerdemain can make it so. That, however, does not mean we conclude that, in either the circumstances presented in *Grady* or presented in this case involving Joan Eberhardy, there cannot be some well thought out procedure by which the decision to sterilize can be made and implemented.

We conclude that the question is not choice because it is sophistry to refer to it as such, but rather the question is whether there is a method by which others, acting in behalf of the person's best interests and in the interests, such as they may be, of the state, can exercise the decision. Any governmentally sanctioned (or ordered) procedure to sterilize a person who is incapable of giving consent must be denominated for what it is, that is, the state's intrusion into the determination of whether or not a person who makes no choice shall be allowed to procreate. The public policy of the state is inevitably involved. If this court were to conclude that, under the facts of this case, Joan Eberhardy should be sterilized, we would be deciding more than the best interests of a particular person in a particular situation. We would be deciding that it is appropriate and not contrary to public policy to order the sterilization of a person when a court decides it is in the best interests of that person to do so.

This case was taken on review for the specific purpose of determining whether the courts of Wisconsin had jurisdiction to authorize sterilizations of incompetents who could not give their consent. But our conclusion that the circuit court has jurisdiction is not dispositive of whether that jurisdiction should be exercised in the unguided discretion of the judge. As Justice Marshall said in *Harrigan v. Gilchrist, supra,* 121 Wis. at 227–28, "A court may have jurisdiction of a particular subject matter, but by settled judicial policy ought not to exercise it."

Under the present state of the law, the only guideline available to circuit courts faced with this problem appears to be the "best interests" of the person to be sterilized. This is a test that has been used for a number of years in this jurisdiction and elsewhere in the determination of the custody of children and their placement—in some circumstances placement in a controlled environment. *See, e.g.,* sec. 48.01(2), Stats. No one who has dealt with this standard has expressed complete satisfaction with it.[14] It is not an objective test, and it is not intended to be. The substantial workability of the test rests upon the informed factfinding and the wise exercise of discretion by trial courts engendered by long experience with the standard. Importantly, however, most determinations made in the best interests of a child or of an incompetent person are not irreversible; and although a wrong decision may be damaging indeed, there is an opportunity for a certain amount of empiricism in the correction of errors of discretion. Errors of judgment or revisions of decisions by courts and social workers can, in part at least, be rectified when new facts or second thoughts prevail. And, of course, alleged errors of discretion in exercising the "best interest" standard are subject to appellate review. Sterilization as it

---

[14] Goldstein, Freud & Solnit, *Beyond the Best Interests of the Child* (1973).

is now understood by medical science is, however, substantially irreversible. A recent report stated:

"Though it is now possible to 'reverse' (surgically restore continuity in) as many as 70% of vasectomies and 30% of tubal ligations, whether full-term pregnancy will routinely result from such restorations remains to be documented. In other words, persons undergoing these procedures should regard them as being permanent and should not expect reversibility." G. T. Johnson and S. E. Goldfinger, *The Harvard Medical School Health Letter Book* 188 (1981).

A similar conclusion is reached by R. Shane and C. Powerstein in *Fertility Control, Biologic and Behavioral Aspects* 115 (1980).

Thus, the tubal ligation of Joan Eberhardy or any other woman pursuant to an order in the exercise of judicial discretion must be considered irreversible. The judicial process could afford no method for correcting an error in the exercise of this discretion. The vague, although frequently useful, "best interest" analysis appears to be inadequate unless there is an authoritative declaration of public policy to guide the exercise of that irreversible discretionary act.[15]

---

[15] For similar reasons, we do not construe sec. 880.38(2), Stats., as providing sufficient guidance. That section provides that, "A guardian of the person shall endeavor to secure necessary care, services or appropriate protective placement on behalf of the ward." A brief review of legislative history shows that this section was enacted as part of legislation establishing protective services for certain disabled and incompetent persons. *See* ch. 284, sec. 31, Laws of 1973, amended by ch. 393, sec. 39, Laws of 1975. We need not and do not decide the scope of meaning of the terms, "necessary care" and "services," in this case, for such unelaborated terms are clearly inadequate to serve as substantive or procedural safeguards of the many sensitive inquiries which would have to be made before a sterilization could, with propriety, be judicially authorized. *Cf., In re Grady*, 85 N.J. 235, 426 A.2d 467 (1981); *Matter of Guardianship of Hayes*, 93 Wash.2d 228, 608 P.2d 635, 639–42 (1980).

In the instant case, scant consideration was given to the possibilities of contraception by means short of sterilization. Although the medical records show that the placement of an IUD was considered, the court record fails to show whether or not this method of contraception was practicable under the circumstances. Moreover, recent publications indicate continued research in contraceptive technology. The possibility that some new or improved method, perhaps suitable for use by retarded persons, might shortly become available without the drawbacks of irreversibility, militates for restraint. *See Journal of the American Medical Association,* April 25, 1980, Vol. 243, No. 16, p. 1617. Such alternative less intrusive methods of alleviating Joan's plight might, as a matter of public policy, require exploration in depth before the alternative of sterilization is ordered.

What these facts demonstrate is that courts, even by taking judicial notice of medical treatises, know very little of the techniques or efficacy of contraceptive methods or of thwarting the ability to procreate by methods short of sterilization. While courts are always dependent upon the opinions of expert witnesses, it would appear that the exercise of judicial discretion unguided by well thought-out policy determinations reflecting the interest of society, as well as of the person to be sterilized, are hazardous indeed. Moreover, all seriously mentally retarded persons may not *ipso facto* be incapable of giving birth without serious trauma, and some may be good parents. Also, there has been a discernible and laudable tendency to "mainstream" the developmentally disabled and retarded. A properly thought out public policy on sterilization or alternative contraceptive methods could well facilitate the entry of these persons into a more nearly normal relationship with society. But again this is a problem that ought to be addressed by the legislature on the basis of factfinding and the opinions of experts.

Court cases, at least until their precedential effects are felt by the public, are little noticed, even by those who are potentially concerned. Although the case of Joan Eberhardy ran the gamut of three levels of court proceedings, none of the numerous groups that represent the interests of retarded or incompetent persons appeared or filed amicus briefs to assist the court. Although the record was well handled by the trial court, and the guardian *ad litem* and the attorney for the guardians gave cogent reasons why sterilization should be allowed, no one played the "devil's advocate" to inform the court why sterilization might be improper in respect to Joan Eberhardy and, particularly, in respect to retarded persons generally, or at least in respect to some who fall within that class.

This case demonstrates that a court is not an appropriate forum for making policy in such a sensitive area. Moreover, irrespective of how well tried a case may be —and we consider the instant one to have been well presented and carefully considered—there are inherent limitations in the factual posture of any case which make the extrapolation of judicially made policy to an entire area of such a sensitive nature as this risky indeed. The legislature is far better able, by the hearing process, to consider a broad range of possible factual situations.[16] It can marshal informed persons to give an in-depth study to the entire problem and can secure the advice of

---

[16] We note, for example, that nowhere in the present litigation is there any reference to the considerations which might be involved in the contraceptive or therapeutic sterilization of *male* incompetent persons. The limited factual posture of this case dictates this narrowed scope of inquiry. We imply no conclusion as to whether the sterilization of a male incompetent would involve the same or different considerations of public policy, individual rights, and "best interests" assessment as for a female incompetent person. We note only that a wider vision than that available to us in the context of this case would be necessary to address such questions.

experts in the field of psychology, psychiatry, sociology, and medicine, as well as in the field of law, to explore the ramifications of the adoption of a general public policy which will give specific imprimatur to the courts to order sterilization in well defined circumstances.

Justice Frankfurter in *Sherrer v. Sherrer*, 334 U.S. 343, 365 (1948) (dissenting opinion), said:

"Courts are not equipped to pursue the paths for discovering wise policy. A court is confined within the bounds of a particular record, and it cannot even shape the record. Only fragments of a social problem are seen through the narrow windows of a litigation. Had we innate or acquired understanding of a social problem in its entirety, we would not have at our disposal adequate means for constructive solution. The answer to so tangled a problem . . . is not to be achieved by . . . judicial resources . . . "

As stated before, the question before this court is not one of power. Rather, it is the prudential use of power —the exercise of judicial restraint. Although Benjamin Cardozo was considered a judicial activist and believed it important for courts to blaze trails where necessary to protect human rights, nevertheless he said:

"The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." Cardozo, *The Method of Sociology. The Judge as a Legislator*, The Nature of the Judicial Process, p. 141.

Elsewhere in the same essay, he said, speaking of judges:

"They have the power, though not the right, to travel beyond the walls of the interstices [of statutes], the bounds set to judicial innovation by precedent and custom." *Id.* at 129.

Having said that prudence counsels caution in the exercise of unquestioned jurisdiction in this troublesome area, the question remains whether a court, which has the obligations under a constitution which mandates the personal right to free choice of whether to procreate or not and which requires equal protection, can properly decline to exercise its jurisdiction. We believe it can and should.

We are dealing with a special class of persons—the severely mentally retarded who cannot, on an informed and voluntary basis, give their consent to an irreversible procedure. And the irrevocability of sterilization in itself places it in a different classification from usual situations where the United States Supreme Court has considered the choice to procreate or not. The choices thus far considered by the Supreme Court are not irreversible, for they involve only a decision affecting a present choice. They do not preclude a different choice at a later time. Sterilization does. The question is, therefore, one of both substantive due process and of classification.

The United States Supreme Court has recognized that, although in many areas minors have the same constitutional rights as adults, because they are a class of special concern to the state, the uninhibited exercise of those rights may be hedged about with restrictions that reflect the public policy of protecting persons of a distinct class. For example, the United States Supreme Court in *Bellotti v. Baird,* 443 U.S. 622 (1979), recognized that the decisional choice of abortion which it had previously recognized for adults (and had held that, as to

minors, the choice could not be flatly proscribed by an absolute state or third-party veto, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976)) could nonetheless be circumscribed by appropriate action requiring a special showing of maturity or "best interests" to make such an important decision without parental involvement, and that such a requirement could be imposed by legislative action. It has also been made clear that a state may constitutionally require a physician to notify, if possible, an unemancipated, dependent, and non-mature minor's parents before consenting to perform an abortion. *H. L. v. Matheson*, ―― U.S. ――, 101 S. Ct. 1164, 67 L. Ed. 2d 388 (1981). Such a law serves, among other state interests, the "important" one of "protecting adolescents."

The mentally retarded, like minors, would appear to fall within a class subject to the special protections of the state. Many (though doubtless, not all) of the mentally retarded are not competent to exercise a free choice. While the Constitution would generally mandate a free choice for *sui juris* adults, a free choice is an empty option for those who cannot exercise it. Moreover, it is by no means certain who should speak for the best interests of the retarded, and those who purport to may have conflicting interests which may well skew the decisions of even the best intentioned. Those who normally would speak for the incompetent—parents, guardians, or even social workers—may in actuality speak, consciously or unconsciously, in their own interests: Diminished worry, convenience, a wish to be relieved of responsibility for close supervision, or frustration at their inability to deal with a most difficult problem. These very considerations may be, indeed, in the interests of the incompetent, but are not necessarily so. *See* Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in*

*Medical Decisionmaking,* 1979 Wis. L. Rev. 413, 473, 478–81.

It is clear then that incompetents must be considered, for the purpose of sterilization, a distinct class to whom the state owes a special concern. The state's interest in affording them protection is great indeed.[17] Because of this special interest and the factor of irreversibility, it is necessary that standards of statewide application reflective of public policy as to both individual and societal interests be adopted. In cases considering sterilization there is little leeway for the development of common law standards based upon the usual judicial procedure of incrementally and eventually developing what is appropriate as a statewide standard. Such an approach would no doubt be even more violative of the interests of incompetents than to set guidelines for discretion based on

---

[17] Indeed, the only expressed existing public policy on the question does reveal differential treatment, and suggests that the state discourages the sterilization of incompetent persons. Wisconsin, like the federal government, funds voluntary sterilizations of competent adults under the family planning provisions of the Medicaid (medical assistance) program. 4 Wis. Adm. Code ch. HSS, secs. 101.03(170) (p. 25); 104.01(7) (p. 51); 107.06(2) (zk) (p. 229); 107.21(1)(b)3g, (c)4, (2) (pp. 286–89). However, these rules—like those of the federal government, 42 C.F.R. secs. 441.250–441.259 (1979)—expressly *exclude* state financial coverage for sterilization of incompetent persons (as well as of persons under age 21 and of institutionalized persons). 4 Wis. Adm. Code ch. HHS secs. 101.03(168), (169) (p. 25); 105.36(1)(d) (p. 170); 107.06(2)(zk) (p. 229); 107.21(3) (p. 289). We recognize that this is an administrative policy judgment rather than a legislative one, and indeed, that it may in reality be a "compelled" policy undertaken by the State Department of Health and Social Services to comply with federal policy in order to ensure federal funding. Nonetheless, it rather clearly connotes the state's concern, as a matter of public policy, over the complex questions of consent and possible abuse which may arise in connection with the sterilization of incompetent persons.

judicial fiat which, as we have pointed out, would be based on too narrow an opportunity to appreciate the broad social implications of the consequences of sterilization.

Restraint is appropriate even in the instant case. While the record amply demonstrates the undesirable consequences of Joan's pregnancy, this consequence is contingent, not certain. The inevitability of the consequences of not acting judicially in this case does not approach the degree that might force a choice if the question were one of invoking state power to order treatment for one who would die without it. The problem of Joan's pregnancy is at the most a probability, while state action to authorize sterilization constitutes an irreversible certainty. It would permanently and irrevocably deprive Joan of her procreative capability. If we view the record most favorably to the relief sought, it is apparent that, for Joan, sterilization would not, in all probability, constitute a burden in fact. But as a matter of law in a situation such as this, a greater burden is inflicted by a judicial decision to act than a decision to withhold action for the present. We would recoil from a generalized rule of law that it is in the best interests of any mentally incompetent to be sterilized. Because we speak precedentially for the entire state, a decision of this court to authorize consent to sterilization is likely to be taken as an enunciation of a generalized rule: It is within the discretion of the trial judge to order sterilization if there is a finding that it is in the best interests of the incompetent. Alternatively, we could establish guidelines that are so restrictive as to substantially eliminate the right of sterilization in most cases, even where appropriate, or guidelines that would be so generalized that they would not reflect adequately social and medical knowledge, and would not reflect a considered and well defined public policy. We reject these alternatives.

We accordingly conclude that it would be inappropriate to either permit the sterilization of Joan Eberhardy where there has been no determination by the legislature of the state's public policy defining what is in Joan's (and others') best interests, or to attempt to set forth at length guidelines when we know that a court is not the preferred branch of government to enunciate general rules of public policy. This task should initially be the legislature's.

We have frequently recognized that we may have jurisdiction to act but nevertheless refrain from doing so. Recently, in *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974), we concluded that, as a result of our common law and constitutional authority, we could probably recognize the tort of wrongful birth, but we said in deciding to not recognize the tort:

"[It] would have vast social ramifications and the creation of such a cause of action is the type of public policy decision that should be made by the people of this state or their elected legislative representatives." (pp. 317–18)

Even in respect to a modification of the rules of comparative negligence, this court refrained from exercising its clear common law authority in order to give the legislature an opportunity to consider the problem. *Reiter v. Dyken*, 95 Wis.2d 461, 290 N.W.2d 510 (1980); *Wisconsin Natural Gas Co. v. Ford, Bacon & Davis Const. Corp.*, 96 Wis.2d 314, 291 N.W.2d 825 (1980).

The social and personal ramifications of authorizing judicial approval of sterilization of incompetents would appear to be considerably more "vast" and sensitive than the recognition of a new tort.

Some state supreme courts have promulgated standards to be used by trial courts in considering petitions for the sterilization of incompetents. *In re Grady*, 85

N.J. 235, 426 A.2d 467 (1981) ; *Matter of Guardianship of Hayes,* 93 Wash.2d 228, 608 P.2d 635, 639–42 (1980) ; *In re Penny N.,* 414 A.2d 541 (N.H. 1980). These guidelines appear to be useful aids to the exercise of judicial discretion, but they reflect, accurately, we assume, the public policy of those states and not of Wisconsin. As we pointed out in discussing *Grady, supra,* the New Jersey Supreme Court, wrote not on a clean slate, as we would be required to do, but after considerable experience with similar problems.

Although the courts of this state have plenary jurisdiction, prudence requires that we refuse to permit its exercise in this case.

The point was well expressed in dissent by Justice Stafford of the Washington Supreme Court in *Guardianship of Hayes, supra,* a case which authorized state courts to consent to the performance of sterilization of incompetents. He said:

"Possession of such power, however, neither requires that it be exercised nor necessarily supports the wisdom of its exercise under all circumstances.

"In this case we are concerned with the permanent and irreversible loss of a fundamental personal right. Those who seek to invade this right do so in the name of 'social need', 'social good' and even 'personal well-being' . . . . In my view, however, there are not only deep-seated medical, sociological, personal and legal issues, but a fundamental issue of public policy involved. What power, then, should society have in this regard; what personal rights should be protected from society; to what extent should they be protected; and in what manner?

"It seems to me that having clearly declared the judiciary's power to act, wisdom dictates we should defer articulation of this complex public policy to the legislature. Such deferral, done with a clear declaration of judicial power, is not an abdication of that power. Rather, it is a recognition that the declared power can be rationally coupled with a conscious choice not to exercise it."

Because we conclude it inappropriate under the present circumstances for circuit courts to exercise their jurisdiction, we direct them, pursuant to our supervisory authority, to refrain from ordering the sterilization of incompetents or of others who are unable to give an informed and voluntary consent to the procedure.

Because we so direct, however, it should not be concluded that this court abrogates its own authority and jurisdiction to act on this subject at a future time if it becomes apparent that the legislature is unable or unwilling to act. Unlike sterilization procedures, our decisions are reversible. In an appropriate case at an appropriate time, this court, if it becomes necessary, could permit the invocation of its original jurisdiction for the further consideration and resolution of this problem. Although the judicial system is not well adapted to the task of examining and evaluating social and medical facts from the viewpoint of public policy, it occasionally becomes necessary to do so. It is not powerless in that respect. By remand to a referee for factfinding, by the process of taking judicial notice of important facts of a legislative nature, and by the exercise of its own discretion (or referral to a trial court for such exercise, which could then be scrutinized on appellate review), the problem posed in this case could be addressed.

The preferred forum, however, is the legislature, and it is there that the public policy issues which arise in a case of this nature should be determined.

We hold that the circuit courts of the State of Wisconsin have constitutional and statutory jurisdiction to consider and decide petitions seeking court authorization for a guardian to give consent to the sterilization of an incompetent ward; but pursuant to our supervisory authority we direct such jurisdiction shall not be exercised

until the state's policy to do so is set forth by appropriate legislation or until further order of this court.

*By the Court.*—Decision affirmed.

COFFEY, J. *(concurring).* An attack on an opinion as comprehensive and well-written as that of the majority should not be lightly undertaken. Nevertheless, I am compelled to write separately because I disagree with several assertions as to the power of circuit courts under the Wisconsin constitution. The circuit court dismissed the petition in this case on the ground that authority to order or approve the sterilization of an incompetent could not be exercised unless granted by statute. The court of appeals, in a well-reasoned opinion, affirmed. The majority states that the jurisdictional view of the circuit court and the court of appeals, being founded solely upon statutory authorization, "is too narrow and does not comport with the precedents of this court." *Supra,* p. 548. I believe it is the opinion of the majority which does not comport with our precedents.

I disagree with the holding of the majority that the jurisdiction of the circuit court to order sterilization of an incompetent need not be conferred by the legislature because it exists under the Wisconsin constitution. I do not question that the constitution grants jurisdiction to the circuit court in civil cases as that jurisdiction was exercised by courts at law or in equity at the time the constitution was adopted. However, the courts of law and equity did not exercise power over all legal relationships. In *Adoption of Tschudy,* 267 Wis. 272, 65 N.W.2d 17 (1954), the court stated:

"Although adoption is a practice of very great antiquity, it was not known in the common law of England and it exists in the United States only by virtue of statutes. . . . In Wisconsin, adoption proceedings are statutory. [Citations omitted]." *Id.* at 281.

In *In re Grbic,* 170 Wis. 201, 174 N.W. 546 (1919), the court quoted the following statement from *Barker v. Dayton,* 28 Wis. 367 (1871):

"It is an undoubted general principle of the law of divorce in this country, that the courts, either of law or equity, possess no powers except such as are conferred by statute; and that, to justify any act or proceeding in a case of divorce, whether it be such as pertains to the ground or cause of action itself, to the process, pleadings or practice in it, or to the mode of enforcing the judgment or decree, authority therefor must be found in the statute, and cannot be looked for elsewhere, or otherwise asserted or exercised." *Id.* at 379.

Seven years ago, this court, in *In re Guardianship of Pescinski,* 67 Wis.2d 4, 226 N.W.2d 180 (1975), held that a personal decision to consent to the surgical removal and transplantation of a kidney could not be made for an incompetent under the doctrine of substituted judgment without legislative authorization. *Pescinski* clearly established that a court has no inherent power to make a personal decision for an incompetent. The jurisdiction to do so depends upon an act of the legislature and not the findings of an individual judge. The majority decision disavows *Pescinski* insofar as it may be read as a ruling of want of jurisdiction. This amounts to overruling the case, because want of jurisdiction was the ground of decision. Judicial restraint requires that we observe the limitations of judicial power, and defer to the legislature, as to those matters which were not the traditional subjects of suits at law or in equity. If we do not, we are endorsing government by judicial fiat, not by law.

What I have said thus far goes to the power of the circuit court to act, which is a form of jurisdiction over the subject matter of the suit, particularly when the only relief which is sought or could be granted on the facts

asserted in the petition is the ordering or approval of a surgical procedure on the body of a living person. In addition to the jurisdiction of the subject matter discussed in sec. 801.04(1), Stats., there is the question of the exercise of the court's jurisdiction, either by personal jurisdiction or jurisdiction *in rem* or *quasi in rem*. These jurisdictional requirements are treated in sec. 801.04(2) and (3). The grounds for exercising personal jurisdiction are stated in sec. 801.05. Only two subsections of the statute need be examined. Sub. (2) allows the exercise of jurisdiction where there are statutes which specifically confer grounds for the exercise of personal jurisdiction over the defendant. No such statute exists in this case. Sub. (1) permits exercise of personal jurisdiction "against a defendant." But the theory of the case at bar is not a proceeding against anyone. There was no named defendant. The caption of the case makes clear that the proceeding is *quasi in rem* because it states, "In the Matter of the Guardianship of Joan I. Eberhardy, Incompetent." Sec. 801.04(3), provides as follows:

"A court of this state having jurisdiction of the subject matter may render a judgment in rem or quasi in rem upon a status or upon a property or other thing pursuant to s. 801.07, and the judgment in such action may affect the interests in the status, property or thing of all persons served pursuant to s. 801.12 with a summons and complaint or notice of object of action as the case requires."

What is the status, property or thing upon which a judgment may be rendered in this case? Apparently the majority is willing to say that the body of a living person falls in that category. I am not.

While holding that the circuit court has the power to authorize or order sterilization of an incompetent without that person's consent, the majority also holds that such power should not be exercised without the prior approval

of this court. I agree with the second point whole-heartedly.

Compulsory sterilization involves termination of the constitutionally protected fundamental right to bear children.

"If the right of privacy means anything, it is the right of the *individual,* married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453 (1972).

The physicial integrity of the human body is a fundamental constitutional right. The courts exist to protect such rights from unwarranted intrusion by the other branches of government, not to facilitate, authorize or direct such intrusion.

I conclude that the power of government to order sterilization of an alleged mentally deficient person, if such power exists, is an administrative power. The initial decision whether to grant it is for the legislature. However, because the power is administrative and legislative in character, relating to the public interest as perceived by those exercising it, it may not be delegated to or exercised by a court. In explaining what constitutes an invalid delegation to the judiciary, this court has said in an annexation case:

"What is 'desirable' or 'advisable' or 'ought to be' is a question of policy, not a question of fact. What is 'necessary' or what is 'in the best interest' is not a fact and its determination by the judiciary is an exercise of legislative power when each involves political considerations and reasons why there should or should not be an annexation. This is the general and universal rule which sharply draws the differentiating line between legislative power and judicial power and by which the validity of the delegation of functions to the judiciary by the legislature is determined." *In re City of Beloit,* 37 Wis.2d 637, 644, 155 N.W.2d 633 (1968).

There is no claim in this case that the legislature has delegated the power to order sterilization to the judiciary. In fact, the legislature has determined as a matter of policy that the power of the state is not to be used to compel sterilization. In 1977, the legislature repealed sec. 46.12, Stats. The repealed statute allowed the Department of Health and Social Services to authorize sterilization of criminal, mentally ill or mentally deficient inmates of state and county institutions, upon the finding of a surgeon, a psychiatrist and the superintendent of the institution that "procreation is inadvisable," after examination into the "physical and mental" condition of the inmates.

If the young woman in this case had been subject to the repealed statute, she could have been sterilized pursuant to administrative decree. Even the repealed statute did not grant power to a judge to take this action. Applying the *Beloit* rule to sterilization, I would hold that whether procreation by a person is "advisable," involving moral and ethical rather than purely legal and factual considerations, is an exercise of the legislative police power rather than the judicial power.

There is no compelling state interest to be served by conferring the power on a court to authorize the sterilization of an incompetent person. The argument advanced in support of compulsory sterilization laws at the turn of the century was that the state had an interest in preventing the birth of mentally retarded children. This eugenics argument assumes that mental retardation is hereditary. We now know that many of the mentally retarded have social and cultural, rather than hereditary roots. They are present at higher rates in populations with inadequate nutrition and prenatal care.

The Scandinavian countries were among the first to enact eugenic sterilization laws. Some thought that the enactment of these laws provided progressive and socially

responsible legislation. It is ironic to realize in retrospect that the same societies which pioneered the concept of the welfare state insisted on the prerogative of controlling the bodies of their members so as to limit the potential claims upon their generosity. It is a short and logical step from preventing the birth of misfits to permitting only the birth of eugenically superior persons, as determined by the state. Thus, in Nazi Germany, it was required that all children of "mixed" marriages be sterilized. Together with the systematic murder of Jews, this policy insured that only the "master race" would survive.

It is argued that the young retarded woman in the case at bar does not have the capacity to make a decision as to whether to bear children, just as she does not have the capacity to consent to sterilization. However, the decision to become pregnant is seldom made consciously, in a cold and clinical setting. Pregnancy most frequently results from an act of love. No one has suggested that this young woman is incapable of love.

The record in this case suggests that doctors at the Marshfield Clinic are not willing to perform the operation unless they receive judicial approval, notwithstanding that it has been approved by the hospital's ethics committee. Thus, the doctors want insulation from legal liability should their judgment turn out to be in error. The professional ethics of the doctors are their own concern, and that of their colleagues. However, I would agree with the trial court holding that it was without authority in the absence of a statute to insulate the doctors from legal liability, if any, by giving approval for the sterilization procedure. No medical emergency appears from the facts of this case. In fact, pregnancy is only a bare possibility. The trial judge stated that any benefit to the young woman was questionable. Some may sympathize with the parents who are concerned for what they

think is the welfare of their daughter, although I find nothing in this record to substantiate their concern. However good their intentions, they are not entitled to seek the rubber stamp of a court in order to carry out their wishes.

The court of appeals carefully considered the same arguments which have been advanced in this court. It determined in a well-written and well-reasoned opinion that in the absence of specific statutory authority, the courts have no inherent power to make the fundamental and irreversible decision to sterilize an incompetent person. The court pointed out that any grant of power to the judiciary would have to be exercised in a standardless vacuum, or standards would have to be created without the benefit of legislative guidance. I agree that the awesome power to deprive a human being of the fundamental right to bear or beget a child may not be inferred from general constitutional or statutory grants of jurisdiction. Rather, it must be conferred by statutory authority, providing guidelines and adequate legal safeguards determined by the elected representatives of the people to be necessary, after full consideration of the constitutional rights of the individual and the general welfare of society. Such authority should be granted only after a thorough consideration of the moral, medical, psychological and ethical, as well as the legal, implications of sterilization and its aftereffects. The only proper forum for such a grant of authority is the legislature. In *State ex rel. Broughton v. Zimmerman*, 261 Wis. 398, 52 N.W.2d 903 (1952), Justice Currie stated the classic definition of separation of powers, quoting from *Fergus v. Marks*, 321 Ill 510, 514, 152 NE 557 (1926):

"The legislative department determines what the law shall be, the executive department executes or administers the law, and the judicial department construes and applies the law."

As I concur, I express great reservation with the following dicta as an invitation to further sterilization litigation:

". . . it should not be concluded that this court abrogates its own authority and jurisdiction to act on this subject at a future time if it becomes apparent that the legislature is unable or unwilling to act. Unlike sterilization procedures, our decisions are reversible. In an appropriate case at an appropriate time, this court, if it becomes necessary, could permit the invocation of its original jurisdiction for the further consideration and resolution of this problem. Although the judicial system is not well adapted to the task of examining and evaluating social and medical facts from the viewpoint of public policy, it occasionally becomes necessary to do so. It is not powerless in that respect. By remand to a referee for factfinding, by the process of taking judicial notice of important facts of a legislative nature, and by the exercise of its own discretion (or referral to a trial court for such exercise, which could then be scrutinized on appellate review), the problem posed in this case could be addressed.

"The preferred forum, however, is the legislature, and it is there that the public policy issues which arise in a case of this nature should be determined.

"We hold that the circuit courts of the State of Wisconsin have constitutional and statutory jurisdiction to consider and decide petitions seeking court authorization for a guardian to give consent to the sterilization of an incompetent ward; but pursuant to our supervisory authority we direct such jurisdiction shall not be exercised until the state's policy to do so is set forth by appropriate legislation or until further order of this court." *Supra*, at 578–579.

In particular, I take exception to the following language:

"We hold that the circuit courts of the State of Wisconsin have constitutional and statutory jurisdiction to consider and decide petitions seeking court authorization for a guardian to give consent to the sterilization of an

incompetent ward; . . . or *until further order of this court."* (emphasis supplied) *Ibid.*

Quoting from my dissent in *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980):

"As Chesterfield Smith, the former president of the American Bar Association, said in his Law Day address:
" '. . . courts are being asked today to solve problems for which they are not institutionally equipped, or at least not as well equipped as other areas of government [such as the legislature].
" '. . . As far as possible, judicial forums should be reserved for doing only that which cannot be done elsewhere.
" 'The American public perceives the courts as a jack-of-all trades available to furnish the answer to whatever may trouble them. Shall a war be prosecuted or peace made? What is life, or when does death begin? Shall racial integration be achieved by . . . busing of children to far away schools? How shall prisons and mental institutions be operated? Shall nuclear power plants be built, and if so, where? Shall the Concorde fly to these shores? Is affirmative action really inverse discrimination? Shall the snail darter survive? [Should a circuit court determine a question of public policy for the citizens of Wisconsin?]" *Id.* at 323–24.

Under the radical expansion of judicial power announced by the majority, will our already overburdened judicial system next face the prospect of a new flood of public policy litigation dealing with issues of who is to receive the benefit of a medical breakthrough? Today, the ever expanding field of medical research is almost taxed to the limits of its fiscal capacity in covering the costs of the professional and highly technical services involved in such areas as cancer research and heart, eye, kidney and liver transplants. Will courts order hospitals to expand their facilities so as to accommodate all who need or want the benefits of new treatment and/or surgical procedures, and will doctors be ordered to ad-

minister and/or perform them? Will the courts take it upon themselves to choose those persons who will receive the benefit of the various medical research programs and refuse others? And, in the area of organ transplants, will the courts decide not only who will receive organs, but also who will donate? Will judges decide on the basis of their belief as to who will be the most productive members of our society in the future or will other factors such as finances and social or political influence be the basis for decision? Will the courts not be faced if we follow the logical process of reason with the question as to why society should not assume control over the individual and subordinate him or her to its own ideas of what is good for the human race? We are opening the door to a never ending series of problems without a rational, moral or ethical solution.

The author of the dissenting opinion in this case recently expounded Smith's philosophy in *State v. Princess Cinema of Milwaukee*, 96 Wis.2d 646, 292 N.W.2d 807 (1980), and refused to infringe on the legislative prerogative of enacting statutes to implement public policy, stating:

" 'The problems of public policy . . . are for the legislature,' and further, 'recognizing that our job is one of interpreting statutes not redrafting [or enacting] them.' " *Id*. at 661–62.

Further, I believe it is incumbent on this court to delineate the express responsibilities and authority of guardians *ad litem* in making recommendations to a court for it seems evident from the record that the guardian *ad litem* was more interested in supporting the position of the parents for their convenience and the doctor involved rather than the poor, unfortunate, retarded adult. A thorough examination of the record reveals that the parental fears of a future pregnancy of this unfortunate young adult, due to her lack of responsibility and/or

necessity of constant supervision, were never thoroughly aired before the court. For there was no testimony presented from her adult, natural brother and sister as reflected in the hospital records regarding their strong feelings as to their parents' oversolicitous attitudes for their sister Joan's (retarded adult) needs:

"They [the brother and sister] feel she is grossly overprotected. It is their feeling that if the parents were able to begin a program whereby Joan would learn self-help skills, she would become partially independent. In fact, they would like to seriously consider placing Joan in an institution for perhaps one year with this goal in mind in order that she would be able to return to the community and be more independent than she is at this time."

One of the doctors who recommended the sterilization procedure in a summary fashion disregarded the adult, natural brother's and sister's recommendation as follows:

"In my opinion the parents have done an excellent job of raising this severely disabled child and what is really being talked about today is simply a matter of style. One set of parents prefers to raise their children in a somewhat different way than another set. One can always quibble about the finer point. In the main, however, I honestly do not feel that a more vigorous program designed at making Joan more independent would be at all appreciably more successful than the style in which the Eberhardys have raised Joan."

Another doctor recommending the sterilization wrote:

"It is impossible for her to be supervised at all moments of her life and the possibility that she could become pregnant is real.

"As you well know, mentally retarded persons possess the same sexual drives and passions as do most human beings, however, they lack the personal and moral responsibilities and the knowledge of the consequences of sexual intercourse."

Quoting from another doctor consulted:

"She attends a summer camp for about a month each year and on several occasions persons at this camp have been approached by members of the opposite sex and it is the fear of [the parents] that Joan might well become pregnant. . . . If the ethics committee would give me medical approval in this situation and I could get the proper legal counsel and Judge ————'s approval, hopefully we could proceed with this procedure in the near future since she goes to camp again. . . ."

The record is clear that the guardian *ad litem* agreed with the parents and the doctors as to the desirability of the sterilization procedure based upon the fear of possible sexual activity in the future due to Joan's lack of judgment and lack of continual supervision and presented no testimony to the court concerning the opposing views of Joan's adult brother and sister in 1971 regarding their sister being grossly overprotected. He did not cross-examine the doctor as to any scientific or medical reference for his opinion that "mentally retarded persons possess the same sexual drive and passions as do most human beings," nor his opinion that "statistically speaking, Joan ———— is most probably capable of reproducing herself." I note the latter fact because the record establishes that the young lady had not undergone a thorough obstetrical or gynecological examination in the immediate or recent past.[1] Further, the record is devoid of any direct testimony that Joan ever participated in any type of sexual activity, and there was no proof in the medical records substantiating or confirming the mother's fears that "Joan might well become pregnant." Neither did the guardian *ad litem* cross-examine the doctor as to his very

[1] The record only reveals that Joan underwent an obstetrical and gynecological "evaluation" in May of 1977 for the purpose of determining whether she was a suitable candidate for an IUD.

definite and firm opinion that the retarded adult had no potential for developing the cognitive and adaptive skills required for successful child bearing. No questions were asked concerning empirical data of the low reproductive rates of mentally retarded persons. No questions were asked about the mortality and morbidity rates associated with sterilization. The guardian *ad litem*, further, did not question nor develop the report in the hospital record "Joan has developed self-sufficiency in respect to other basic personal skills as hygiene and feeding . . . and has sufficient vocabulary to make her basic needs known and can respond to questions in short, well-articulated sentences." The most obvious deficiency of the case presented by the guardian *ad litem* is his failure to bring out the fact that the medical opinions as to Joan's condition ranged from "moderate mental retardation" to "moderate *severe* mental retardation." (Emphasis supplied.) The explanation for this change in opinion may be that Joan's mental faculties were deteriorating from overprotection and lack of independent training in self-help skills. However, that may not be the only explanation. It is for these reasons that I point out the necessity for this court to delineate the responsibilities of the guardian *ad litem* in a matter such as this. In my view, this record presents problems as to the guardian *ad litem's* responsibilities to his ward in a true adversary system. The record is devoid of any meaningful cross-examination of either the parent-guardians or the pediatric physician.

It is my belief that this decision is a most difficult one and should never be made by courts alone as it involves a value judgment central to the constituent fabric of our society. We all ought to be involved in making this decision whether we participate as a litigant, judge, attorney, physician or as an American citizen, voting for elective representatives. In an age when the

courts are for the first time declaring retarded individuals to be of equal worth with other individuals in our society and under our constitution, mandating equal educational and training opportunities, it seems anomalous that equal justice is being threatened. This is a decision on a subject matter which our society will be grappling with for years to come.

I question the physician's judgment in this case based on the court record presented for review and wonder if it is an attempt to substitute the quality of life ethic for what should be the sanctity of life ethic in medicine. In this case, it is most important to examine the rationalization involved in this medical management decision in order to understand the implications of this recent development in medical ethics and its significance for the profession and society as a whole. The rationale is easy to understand in relation to the new quality of life ethic so eloquently propounded by the social engineers of the Twentieth Century. Two questions are presented: Should a group of doctors whose only basis for this fundamental and irreversible medical, surgical procedure according to this record is the guardian's request based upon a fear that this young retarded adult may in the future have sexual contact with a man in the absence of statutory guidelines and authority be allowed to substitute their judgment for society and assume complete control over the individual and subordinate her to their own ideas of what is good for her well-being? Does any court ever have direct power over the body of a living person in the absence of a showing that the life of the person is in jeopardy requiring medical attention? I think not.

For the foregoing reasons, I would affirm the decision of the court of appeals without modification, but concur in the result of the majority opinion.

DAY, J. (*dissenting*). I dissent: The majority is wrong in refusing to permit the circuit court to authorize the sterilization of Joan Eberhardy, even though it admits the circuit court has the power to do so.

Two thousand years ago a judge, clothed with the power and authority to do justice, but sensing the political winds ("willing to content the people" as the ancient word puts it), washed his hands and said to the people: "See ye to it." His act resulted not in justice but in injustice. Today, the majority of this court, in my opinion, withholds justice from Joan Eberhardy. It turns to the legislature, the "representatives of the people," and says in effect, "you see to it." Washing its hands and turning the demand for justice over to the legislature demeans this court, denigrates its role, and makes a mockery of its powers.

The majority cannot be unaware that the legislature will do nothing about this matter. In today's political atmosphere, few, if any, state legislators would sponsor or support sterilization legislation. The legislature would, of necessity, have to deal with the whole gamut of when sterilization could be done. It could not legislate for this young woman alone. Such legislation will not be forthcoming, and for this court to tell this unfortunate woman's parents to turn to the state legislature is to leave them without justice and without hope.

Justice is denied in refusing to permit Joan Eberhardy to have an operation that is the only practical[1] way to prevent her from a possible pregnancy that her physician said would be "tragic."

Let's look at this "child-woman" described by her doctor as "this most unfortunate individual," whose "right to procreate" the majority wishes to protect.

---

[1] See footnote 3, *infra.*

At the time of the hearing in the trial court she was twenty-two years old but had the mental capacity of a two-year old child.

She can't cut her food on the plate.

She often puts clothes on inside out.

She can't find her way home if taken any distance from the house.

She is unaware of the danger from traffic.

The majority opinion says, "although she could bathe herself, she could not safely regulate the temperature of her bath." (*Supra*, p. 544). But it's worse than that. Her father testified: "She cannot draw her bath. She would step in ice cold water or scalding water. She doesn't know the difference."

She cannot take care of herself during menstruation.

She is sexually mature and ". . . has the same sexual passions as most human beings," according to her doctor. He further stated she could become pregnant "if she were not under complete and total surveillance at all times." She lacks the moral sense or mental capacity to resist sexual exploitation by others.

She would be unable to understand or communicate physical symptoms and pain during pregnancy or delivery and would be totally baffled and noncomprehending as to what was happening to her.

Her father described her potential pregnancy: "It would be something terrible for her for something like that to happen."

Her doctor described a potential pregnancy as "tragic" for her.

Even the majority opinion recognizes that Joan Eberhardy's mental condition had deteriorated during the period 1971 to 1978. (*Supra*, p. 544). But the decline is not arrested. Dr. Louis J. Ptacek[2] was asked at

---

[2] Dr. Ptacek, in my opinion, has very impressive credentials. He is board certified in Pediatrics and is a pediatric neurologist.

the hearing by the trial judge if there was "any possibility of improvement in her condition as she grows older?" Dr. Ptacek replied: "None at all, I believe over the years there would be some deterioration." Dr. Ptacek was firm in his recommendation that tubal ligation was in Joan Eberhardy's best interest.

Her parents sought the help of the Wisconsin court system to get authorization for a tubal ligation to prevent this tragedy.

Three doctors, including a psychiatrist, requested it. Her guardian *ad litem* requested it. The ethics committee of St. Joseph's Hospital approved it.[3]

The trial court said that, ". . . given the facts stated . . . [she] is a proper subject for sterilization."

The Court of Appeals said, ". . . the evidence is undisputed that it [sterilization] will serve her best interests." *In the Matter of Guardianship of Eberhardy,* 97 Wis.2d 654, 664, 294 N.W.2d 540 (Ct App 1980).

But a majority of this court finds that this pathetic, helpless, vulnerable, "most unfortunate individual" has a *"right"* to become pregnant! And further, under the superintending powers of this court, the whole judicial machinery will grind to a halt and will refuse to exercise

---

At the trial he testified that he has seen thousands of mentally retarded people. He was medical director at Southern Colony and Training School at Union Grove, Wisconsin, for five years and had responsibility for some 1,800 retarded patients. He said, "For at least twenty-four years I have had the responsibility of the diagnosis and treating of individuals who are retarded."

[3] On May 18, 1978, Thomas J. Rice, M.D., wrote to Raymond E. Burrill, M.D., chairman, ethics committee St. Joseph's Hospital, recommending a tubal ligation for Joan Eberhardy. Among other things, he said: "I considered other methods of protection, however, aside from the I.U.D., I doubt that anything would be of value, and I hesitate to use this in her case."

On May 23, 1978, Dr. Burrill wrote to Dr. Rice: "Joan Eberhardy was approved by the medical ethics committee for sterilization."

Dr. Louis J. Ptacek testified that the ethics committee was made up of ". . . several physicians including a psychiatrist, and

its power in order to guarantee this "right" to her. The court will do so in spite of the fact that those nearest and dearest to her, her parents, and her doctors and her guardian *ad litem,* all want her to have the operation.

The majority cites from the language of *Carey v. Population Services International,* 431 U.S. 678, 685 (1977),

"The *decision* whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected *choices* . . ." (Emphasis added.)

The majority opinion of this court then says:

". . . that the right to procreate or to prevent procreation is a protected, fundamental personal decisional choice appears to be clearly relevant to the case before us." (*Supra,* pp. 562–563.)

But the important words in the *Carey* quotation are "decision" and "choices." When is Joan Eberhardy's "personal decisional choice" to be exercised by her? The answer is *never.*

The majority recognizes that there is an area of decisional choice protected by the due process clause of the 14th Amendment. This protection embraces the right of personal decisions in matters of procreation, and includes the right of the individual to decide to procreate or to decide to prevent pregnancy. The right to prevent pregnancy by use of contraceptives is clearly established by the decisions of the United States Supreme Court. The right to prevent pregnancy by sterilization, as the majority concedes, also "implicates a protected personal procreative decisional choice." (*Supra,* p 562.) This important distinction between the "right to procreate" and the "right to decide" is central to this case. Because that right to decide this issue cannot be exercised by Joan, the

---

I believe people from the hospital administration and from the Diocese of La Crosse."

majority concludes that it may not be exercised by others for her. What the majority fails to recognize is that its refusal to permit Joan's parents, guardians and physicians to make this decision for her simply decides the question for her in another way and against her best interests. By refusing to authorize a trial court to consent to the operation, the court has effectively made a fundamental personal choice for Joan—she will remain susceptible to a "tragic" pregnancy. Because she lacks the mental capacity or moral sense, Joan cannot even choose to abstain from sexual conduct.

The majority opinion goes to great length to analyze the New Jersey Supreme Court's decision in the case of *In re Grady*, 85 N.J. 235, 426 A.2d 467 (1981), where that court in a well-reasoned opinion, in a fact situation similar to the one here, authorized sterilization of a mentally retarded young woman. The New Jersey court held that an incompetent had the same right as any other person to choose sterilization. The court recognized that the "choice" made by parents, guardian *ad litem* or a court was not really the incompetent's but said: ". . . it is a genuine choice nevertheless . . . one designed to further the same interests she might pursue had she the ability to decide herself." *In re Grady, supra,* 426 A.2d at 481.

The majority of this court says:

"The fault we find in the New Jersey case is the *ratio decidendi* of first concluding, correctly we believe, that the right to sterilization is a personal choice, but then equating a decision made by others with the choice of the person to be sterilized. It clearly is not a personal choice, and no amount of *legal legerdemain* can make it so." (*Supra,* p. 566.) (Emphasis added.)

I would add that no amount of "legal legerdemain" can escape the fact that the New Jersey court acted correctly in granting the very relief asked for here and denied by this court. Whether the *ratio decidendi* is "substituted

consent" or "best interest," the result is what is important.

If a person who was incompetent or unconscious due to injury needed an emergency appendectomy, does anyone doubt that a court would authorize the operation? What is the difference to the one needing the operation which *ratio decidendi* was used? The majority cites *In re Guardianship of Pescinski,* 67 Wis.2d 4, 226 N.W.2d 180 (1975), in support of its argument against the rationale of the New Jersey court. In *Pescinski* the majority of this court rejected the concept of "substituted judgment."[4]

The majority then lays before us its view of the issue:

"Any governmentally sanctioned (or ordered) procedure to sterilize a person who is incapable of giving consent must be denominated for what it is, that is, the *state's intrusion* into the determination of whether or not a person who makes no choice shall be *allowed to procreate.*" (*Supra,* p. 566.) (Emphasis added.)

It does sound ominous! But we are dealing with Joan Eberhardy, a helpless person. The "intrusion" is really by her parents who have loved, cared for, watched over and worried about her all her life. It is by her doctors who have treated her and are concerned about the harm a pregnancy will cause her. It is by her guardian *ad litem* who obviously has a keen sense of his role and responsi-

---

[4] In that case the guardian of the incompetent consented to a kidney transplant to save the life of the incompetent's sister, a woman thirty-nine years of age with six minor children. The case was decided by this court on March 4, 1975. The sister, Elaine Jeske, died on January 5, 1977. According to her death certificate, the "immediate cause" of death was "intracerebral hemorrhage." Under "conditions contributing to death but not related to cause" was listed "3rd state renal [kidney] disease." Death Certificate #77200078, dated February 14, 1977, Local File No. 78, on file with the Section of Vital Records, Wisconsin Department of Health and Social Services.

bility. In short, it is by those in the best position to know what is in her best interest. Viewed thus, the "state" acting through the court, is far from an "intruder" but plays the noble role of *parens patriae* for one who needs its help. I doubt that even the majority seriously believes Joan Eberhardy should be "allowed to procreate." (*Supra,* p. 566.) Carried to its logical conclusion that position would say that watching over her, "protecting" her, is interfering with her "right to procreate." Merely stating it shows its absurdity.

The majority opinion states that if it permitted the sterilization of Joan Eberhardy it would be setting precedent "that it is appropriate and not contrary to public policy to order the sterilization of a person when a court decides it is in the best interests of that person to do so." (Slip Opinion, p. 566.) And so it should. The question here is really not "ordering," but permitting, an operation that clearly is in the best interest of Joan Eberhardy as all those most closely associated with the case have repeatedly and persistently declared. This court has declared many times what is or is not against public policy. Why not here? The majority's concern for "precedent" is over-apprehensive. The "precedent" that would be established on the facts in this case would be narrow indeed. Future cases will as always be judged on the particular facts as they arise and appropriate guidelines to prevent abuse could be set by this Court.[5]

The majority opinion recognizes that the trial court does have the inherent authority to permit the sterilization of Joan Eberhardy. In light of *Stump v. Sparkman,* 435 U.S. 349 (1976), no other conclusion could reasonably be drawn.

---

[5] See, for example, the sterilization guidelines established by the New Jersey Supreme Court. *In re Grady, supra,* 426 A.2d at 483 (1981).

I think the majority opinion could have been a *landmark* decision on the authority of this court to act in the absence of specific statutory authorization. Unfortunately, it is weakened by an unreasonable and unjustifiable retreat with much rhetoric about "judicial restraint" that presents no workable guidelines as to when such restraint should be exercised. The facts in this case are so demanding for action that, because action is denied here, anyone looking for rule or guide can only conclude that if the legislature hasn't specifically granted a particular authority, inherent power should not be relied upon. This of course flies in the face of a long line of cases in which this court has acted in the great common-law tradition and fashioned remedies where facts demanded it.

The majority, to justify this result, explains that this court would be required to write "on a clean slate." (*Supra,* p. 577.) The "clean slate" results from the want of precedent in this state on the question posed. That other state courts, operating with similar grants of plenary judicial power, have reached the issue, seems to the majority an insufficient "start" to a resolution of the problem. The court draws from the writings of Cardozo, but overlooks his further observations that: "We do not pick our rules of law full-blossomed from the trees" and that a judge's "duty to declare the law in accordance with reason and justice is seen to be a phase of his duty to declare it in accordance with custom." Cardozo, *The Nature Of The Judicial Process,* at pp. 103 and 107. (New Haven, 1945). Sometimes of course, this search for the law is difficult, but to resort again to Cardozo:

"What really matters to me is this, that the judge is under a duty, within the limits of his power of innovation, to maintain a relation between law and morals, between the precepts of jurisprudence and those of reason and good conscience. . . . This is judicial legislation, and the judge legislates at his peril. Nevertheless, it is the necessity and duty of such legislation that gives to judi-

cial office its highest honor, and no brave and honest judge shirks the duty or fears the peril.

"You may say that there is no assurance that judges will interpret the *mores* of their day more wisely and truly than other men. I am not disposed to deny this, but in my view, it is quite beside the point. The point is rather that this power of interpretation must be lodged somewhere, and the custom of the constitution has lodged it in the judges. If they are to fulfill their function as judges, it could hardly be lodged elsewhere." *The Nature Of The Judicial Process, supra,* at pp. 133–136.

Because I am persuaded that it is this court's duty, I would grant the petition. Unlike the majority, I do not see our task as one of statute writing. Rather, I believe our task under the facts of this case is to authorize the Wood county circuit court to grant the Eberhardy's petition seeking sterilization of this retarded child-woman.

Unlike the legislature which deals with broad issues of social policy,[6] courts deal with individual cases. It is from the resolution of cases that the common law evolves.

The majority opinion goes into considerable detail on the origin, history and demise of Wisconsin's 1913 sterilization statute that was repealed in 1977. The majority concludes that it is "irrelevant to the problems posed by this case." I agree. But it adds proof, if any is needed, that the legislature will not take action to protect the Joan Eberhardys of this state.

This case is ripe for decision. The facts are clear. The court has the authority and should exercise it to permit an operation that is clearly in Joan Eberhardy's best interest.

The court expresses grave concern that the sterilization procedure is "irreversible"[7] and says: "It would per-

---

[6] As, for instance, when it deals with comprehensive revision of divorce laws or adoption proceedings.

[7] The record includes a letter from Thomas J. Rice, M.D., dated May 21, 1979, in which he proposes use of the "Pomeroy tech-

manently and irrevocably deprive Joan of her procreative capability." (*Supra,* p. 575). But in Joan Eberhardy's case one would hope the operation would be permanent. One can hardly imagine wanting to reverse the procedure so she could become pregnant!

The majority says that "scant consideration was given to the possibilities of contraception by means short of sterilization." (*Supra,* p. 569.) The fact is her medical advisor did consider them and rejected them.[8] The majority then says, "The possibility that some new or improved method, *perhaps suitable for use by retarded persons* might shortly become available." (*Supra,* p. 569.) (Emphasis added.) What has that to do with the case before us? In my opinion, nothing. Under the logic of the majority, no one should be allowed to do anything that could possibly "interfere" with the "right to bear children" when the person in question is incapable of making the choice herself.

Then the majority tells us that among: ". . . seriously mentally retarded persons . . . some may be good parents." (*Supra,* p 569.) But the medical testimony here was that Joan Eberhardy could not possibly care for a child, so the majority's observation, if true, would have no relevance here.

The majority opinion recognizes that Joan Eberhardy's parents brought this action for the "physical and mental well-being of Joan." (*Supra,* p. 558.) Then why turn our backs on her? The majority says that "no societal benefits were urged." But isn't society benefited when the mental and physical well-being of the least among us are fostered and protected? We go to great lengths to defend and protect the rights of the most despicable criminal. Shouldn't this unfortunate child-woman share equally in our solicitude?

---

nique" of tubal ligation, which has a sixty to seventy percent chance of successful reversal.

[8] See footnote 3.

The majority laments the lack of what it calls a "devil's advocate" at the trial to argue "why sterilization might be improper." (*Supra,* p. 570.) But that role has been most ably played by the majority in its long opinion. If, as Shakespeare tells us: "The devil can cite Scripture for his purpose,"[9] it is obvious that mere man-made law is likewise readily available.

As authority for its nonaction, the majority has a Wisconsin precedent, "A court may have jurisdiction of a particular subject matter, but by settled judicial policy ought not to exercise it." The quote is from the granddaddy of long opinions, *Harrigan v. Gilchrist,* 121 Wis. 127, 227–228, 99 N.W. 909 (1904). At 334 pages, *Gilchrist* holds the all-time record for judicial verbosity in Wisconsin. It is a veritable gold mine of legalisms. Had the majority mushed on to pages 234–235, it would have found this gem:

"To support the proposition last suggested it is insisted that there are no precedents to be found in the books, of any suit exactly like this, . . . True, the suit is novel in character, but so are the alleged circumstances giving rise thereto. . . . In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice where legal remedies are infirm. Precedents will be a constant guide, but never a bar. Where a new condition exists, and legal remedies afforded are inadequate or none are afforded at all, the never-failing capacity of equity to adapt itself to all situations will be found equal to the case, extending old principles, if necessary, not adopting new ones, for that purpose. That is a very old doctrine." *Harrigan v. Gilchrist, supra,* 121 Wis. at 234–235.

The result was that the *Gilchrist* court decided exercise of jurisdiction was proper despite the novelty of the unprecedented action.

But the majority opinion is not without a sense of humor. "Unlike sterilizations, our decisions are reversi-

---

[9] "The Merchant Of Venice," Act I, scene 3, line 98.

ble," it quips. Then comes the admonition that if the legislature does not act, this court can "permit the invocation of its original jurisdiction for the further consideration and resolution of this problem" . . . "in an appropriate case at an appropriate time." (*Supra*, p 578.)

What more "appropriate case" could it want? Where the mental age of the unfortunate is one instead of two? What more "appropriate time" will ever present itself?

The old adage that "Hard cases make bad law" has a corollary—"Bad law makes hard cases." And so this decision will make help for the Joan Eberhardys of this state impossible for years to come. It will also adversely affect the exercise of the very power it claims to uphold —the power of the court to act in the absence of legislative mandate.

Perhaps people in the position of the Eberhardys, if their circumstances permit, will be able to get help in states where a more enlightened attitude toward their plight prevails.

Maybe someday, even in Wisconsin, those with power to do justice will not ask for the wash basin.

I would reverse.

WILLIAM G. CALLOW, J. *(dissenting)*. In addressing the matter of whether the court should respond to a petition to authorize the parents and legal guardians of Joan Eberhardy, an incompetent, to consent to her surgical sterilization, the majority opinion "conclude[s] that the question is not choice because it is sophistry to refer to it as such, but rather the question is whether there is a method by which others, acting in behalf of the person's best interests and in the interests, such as they may be, of the state, can exercise the decision." (*Supra*, p. 566.) The majority denominates any governmentally sanctioned procedure to sterilize as "the state's intrusion into the determination of whether or not a per-

son who makes no choice shall be allowed to procreate."
(*Supra,* p. 566.) The majority correctly found this
matter generally within the constitutionally granted
plenary jurisdiction of this state's unified court system,
but because of what it perceives as complex problems of
public policy, the majority concludes it is better to defer
to the legislature as the more appropriate forum to pro-
vide the answer to the problem. Because the majority
declines to permit the trial court to exercise jurisdiction
and thereby respond to the Eberhardys' petition, I dis-
sent.

I believe my colleague, Justice Day, is correct in his
dissent that legislative action on this issue is unlikely.
Apart from any aversion legislators may have to address-
ing a controversial question, there is the added practical
problem of the press of legislative business. The thou-
sands of problems presented to the legislature tax its
ability to respond thoughtfully to the multiple problems
of society. I have no reason to expect that this problem
will receive meaningful consideration expeditiously
enough to produce a legislative answer to the question
presented by the Joan Eberhardy case. I am prepared to
assume that even if legislative action were taken, it would
not deny the relief sought on behalf of Joan Eberhardy.
Rather, it would establish guidelines and standards for
the court to use in rendering a decision to grant or deny
the petition for court sanction of the requested steriliza-
tion. I do not agree with the majority in its conclusion
that because the legislature has greater fact-finding capa-
bilities than this court, it is better able to establish the
guidelines and standards within which the trial court
must exercise its discretion.

It is evident from reading the majority opinion that,
had it concluded that this matter was a proper subject for
judicial determination, articulating the factors warrant-
ing consideration whenever this question is presented

does not need vast scientific and medical input. It is applying the factors in a given case which will require expert testimony and a fact-finding apparatus. I am confident that this court is able, with the assistance provided by the thoughtful work of other courts having also considered the problem, to articulate standards by which the decision to sterilize an incompetent can be made. But neither we nor the legislature will make the decision in a particular case, and we must recognize that the yeoman's task will be in laying the evidence alongside the standards and reaching the final conclusion.

This leads me to believe that the majority's deference to the legislature is not based upon any recognition of that body's superior capabilities to deal with the procedural aspect of this matter. Instead, I believe it is much more fundamental: The very first and most vital issue is not when, how, or by whom such a decision should be made, but whether, in the abstract, it should ever be made. I see nothing about this question which renders it more amenable to legislative than judicial resolution, and as a matter of policy, this court should answer affirmatively that there may be circumstances under the present state of medical knowledge in which it is in the best interests of an incompetent to be surgically sterilized.

The majority, after reference to a number of United States Supreme Court decisions, concludes that the nature of any individual's decision to procreate or not to procreate, as a fundamental and constitutionally protected decisional choice, is "clearly relevant to the case before us." (*Supra,* p. 563.) I agree. The difficulty is developing a judicial rationale which protects this intensely private and personal right but at the same time accommodates the fact that the individual whose right to choose must be protected is (and will continue to be) incapable of making the choice for herself. The supreme

court of the state of New Jersey in *In Re Grady*, 85 N.J. 235, 426 A.2d. 467, 474–75 (1981), recognizing this problem, stated:

"Implicit in both these complementary liberties is the right to make a meaningful choice between them. Yet because of her severe mental impairment, Lee Ann does not have the ability to make a choice between sterilization and procreation, or between sterilization and other methods of contraception—a choice which she would presumably make in her 'best interests' had she such ability. But her inability should not result in the forfeit of this constitutional interest ôr of the effective protection of her 'best interests.' If the decision whether or not to procreate is 'a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice.' *Quinlan, supra,* at 41, 355 A.2d 647. To preserve that right and the benefits that a meaningful decision would bring to her life, it may be necessary to assert it on her behalf."

What mechanism exists by which a right to choose may be asserted on behalf of one who is incapable of choosing? The New Jersey court concluded that with the proper guidelines the decision could be made by a court. The majority criticizes the *Grady* court's substituted choice rationale, stating "[w]e believe it somewhat inconsistent for the New Jersey court to equate in a single breath 'the choice made in her behalf' and 'providing her with a choice.'" (*Supra,* p. 566.) I am troubled by this superficial criticism, and I believe it is a disservice to the reasoning of the New Jersey court. There is no "legerdemain" in recognizing the stark reality that Lee Ann Grady could not make the choice herself. Nor is there any legerdemain in permitting a trial court, upon a detailed analysis of what is in her best interests, to make a decision on her behalf. This is the substance of the *Grady* decision. Is it legerdemain to say that this substituted

judgment by the trial court provides her with a choice? Even if the New Jersey court seriously contended that the court's choice was Lee Ann's choice, that contention might at worst be considered naive. But it is obvious from reading the entire opinion that the *Grady* court recognized the result as being exactly as the majority claims it is: "the state's intrusion into the determination of whether or not a person who makes no choice shall be allowed to procreate." (*Supra,* p. 566.) So what is to be said about the doctrine of substituted judgment? It is not legerdemain, as the majority pejoratively describes it. It is a legal fiction designed to give Lee Ann Grady the benefit of that very precious and protected right to choose and to accord her the dignity as a human being of making the choice "she would presumably make in her 'best interests' had she such ability." 462 A.2d at 474. Perhaps this, too, is a naive assumption. But as long as we must wrestle with the notion that even one incapable of choosing has a right to choice, a notion that exists only in the theoretical, not the practical, realm, we must use a *ratio decidendi* of equivalent ethereality to deal with it.

But as a court dealing with real controversies and, in this case, a child-woman of twenty-two years of age who is faced with a real problem, we cannot permit our obligations to be so easily excused because we cannot resolve what appears to be an insoluble philosophical conundrum. In the final analysis, it is unimportant whether the justification for state intrusion is that the choice is really that of the incompetent merely exercised by a substituted competent entity, or that the choice, as the state's choice, is made in the best interests of the incompetent and, as such, best vindicates her constitutionally protected rights. What is important is that the choice be made. That was the result in the *Grady* case, as well as in *Matter of Guardianship of Hayes,* 93 Wash.2d 228, 608 P.2d

635 (en banc 1980), and *In Re Penny N.*, 414 A.2d 541 (N.H. 1980). I believe it should be the result here.

Returning to the ultimate question for a moment—that being whether, in the abstract, sterilization of an incompetent should ever be authorized—it is significant to me that, as pointed out by Justice Day, to answer that question with an unequivocal "no" (the practical effect of the majority decision) is itself to make a personal choice on behalf of the incompetent. Not only does it resolve the question of the incompetent person's choice to procreate or not to procreate in a different but equally substitute manner, that is, the state deciding in favor of procreation, but it does so without any procedural safeguards or any consideration of the incompetent person's best interests. I wonder, should Joan Eberhardy become pregnant while waiting for legislative action, if a court can exercise its jurisdiction to determine whether it is in her best interests to carry the child to term?

From the standpoint of sheer common sense concerning the matter of sterilization, it is far better to fashion a remedy that will permit reasoned results in particular cases according to the needs and interests of the individual incompetent person involved than the nonremedy this court today endorses by judicial default: That Joan Eberhardy, and any other similarly situated incompetent person, cannot be surgically sterilized regardless of whether that decision is in her best interests. For a trial court to authorize this procedure clearly is, as the majority describes, state intrusion into a very personal decision, but I do not find intrusion offensive if failure to intrude produces a harmful, even tragic, result.

Having concluded to this point that there may be instances where surgical sterilization is in the best interests of an incompetent person, I further conclude, as in *Grady, Hayes,* and *Penny N.,* that the power to authorize such a procedure in a particular case should reside with the

trial courts of this state. It cannot be placed exclusively with the parents or legal guardians because the interests of the parents or guardians may not always be consistent with the interests of the incompetent. The trial courts of this state are seasoned decision makers accustomed to applying the "best interests" standard in other circumstances affecting the rights of those who cannot decide for themselves. Moreover, by definition, a trial court is a fact-finding entity, and it has at its disposal, through adversarial processes, amici curiae, independent experts, and guardians ad litem, a considerable capacity to generate evidence bearing upon any given case. Finally, the decision of the trial court is subject to review by appellate courts. An aggrieved party could seek a stay of a sterilization order and appeal.

Despite the majority's dissatisfaction with the "best interests" standard, I believe it is suitably flexible and familiar to trial courts and should be applied to this situation. Therefore, as a general rule, a trial court should be able to authorize the surgical sterilization of an incompetent person only if it finds, by clear and convincing evidence, that such a procedure is in the best interests of the incompetent person. In any proceeding the incompetent must be represented by a guardian ad litem, and the trial court should be encouraged to obtain independent, expert assistance. And in every case, such a decision must be preceded by a finding that the incompetent person lacks the capacity to make a decision in this regard and is not likely to acquire that capacity in the foreseeable future.

In making the determination whether sterilization is in the best interests of the incompetent, the court should consider, among any other factors thought to be relevant, the following factors, which I have drawn from the *Grady* and *Hayes* cases:

(1) The physical capability of the incompetent person to procreate.

(2) The likelihood that the person will engage in sexual activity.

(3) Any physical, psychological, or emotional trauma the individual is likely to experience as a result of pregnancy.

(4) Any physical, psychological, or emotional trauma the individual is likely to experience as a result of the sterilization procedure.

(5) The age and present and projected educability of the individual.

(6) The availability, feasibility, or advisability of other means of contraception.

(7) The individual's ability to care for and rear a child.

(8) Insofar as any evidence bearing on these factors comes from the proponents of the sterilization procedure, the extent to which the proponents are or appear to be acting in their own or the general public's interests as opposed to the best interests of the incompetent.

That these factors can be listed in so short a space should not be a sign that the decision itself is to be made lightly or without all due deliberation. The trial court should recognize that there is a heavy presumption against sterilization in every case, and the above-listed factors should be weighed against that presumption. This means that doubts should be resolved against the procedure; that gaps or insufficiencies in the evidence must be presumed to cast doubt upon the appropriateness of the procedure. Only if the trial court, after considering these and other relevant factors in light of the presumption against the procedure, finds by clear and convincing evidence that sterilization is in the incompetent person's best interests, may the court authorize the procedure.

The majority opinion expresses fear that this resolution of the issue in this case would establish precedent that sterilization of any person would be acceptable if in the best interests of the person to be sterilized. Certainly

this case could not stand for the proposition that *any person* is subject to court authorized sterilization; it would only be applicable to those persons who are incompetent to exercise the choice in their own behalf and for whom the court finds that sterilization is in their best interests. But other than making the initial, albeit awesomely weighty, determination that sterilization is a legal alternative, it need not open the floodgates for sterilizations en masse or necessarily raise the spectre of self-appointed advocates of sterilization for the public good or even of self-serving parents or guardians clamoring for court orders. While it is probably unnecessary, I would caution the trial court to recognize that the decision is a most profound one which is, in all likelihood, irreversible.

In sum, I think it is most unfortunate that the majority has chosen to defer to the legislature on this matter. While I agree the case involves a fundamental policy question, these are not strangers to this court. The people of this state have the right to apply to the courts for the protection of their inherent human rights to life, liberty, and the pursuit of happiness and to have their applications for relief adjudicated. The rights of those least able to protect themselves are the rights most in need of judicial attention. Joan Eberhardy should have a judicial determination on this critical issue which can have a profound effect on her ability to live a happy and healthy life.

With the establishment of guidelines to assist the trial court in making this decision, I would reach the policy question the majority avoids, reverse the decision of the court of appeals, and remand the case to the trial court for the exercise of its discretion in accordance with those guidelines.